**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CARY GRILL, Individually and On Behalf of All
Others Similarly Situated,

               Plaintiff,

       vs.

BIOGEN IDEC INC., WILLIAM RASTETTER,
and JAMES MULLEN,

               Defendants.

)
)
)
)  **CIVIL ACTION NO.**
)
)
)
)  **CLASS ACTION COMPLAINT**
)
)
)
)  **JURY TRIAL DEMANDED**

# 05 - 10453 RCL

## NATURE OF THE ACTION

MAGISTRATE JUDGE _____

1.     This is a federal class action on behalf of purchasers of the publicly traded securities

of Biogen Idec Inc. ("Biogen" or the "Company") between February 18, 2004, and February 25, 2005

(the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the

"Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17

C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of

the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including

the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, Cary Grill ("Plaintiff"), as set forth in the accompanying certification, incorporated by reference herein, purchased Biogen securities at artificially inflated prices during the Class Period and has been damaged thereby.

7. Defendant Biogen is a Delaware corporation that maintains its principal executive offices at 14 Cambridge Center, Cambridge, MA 02142.

8. Defendant William H. Rastetter ("Rastetter") was, at all relevant times, the Company's Executive Chairman.

9. Defendant James C. Mullen ("Mullen") was, at all relevant times, the Company's Chief Executive Officer.

10. Defendants Rastetter and Mullen are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Biogen's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.c., the market. Each defendant was provided with copies of the Company's reports and

press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

11.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Biogen between February 18, 2004, and February 25, 2005, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

12.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Biogen's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by Biogen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Biogen; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

16.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    Biogen Idec Inc. develops, manufactures and commercializes novel therapies. As of December 31, 2003, it had four commercial products: Avonex (Interferon beta-1a) for the treatment of relapsing multiple sclerosis (MS), Rituxan (rituximab) and Zevalin (ibritumomab tiuxetan), both of which treat certain B-cell non-Hodgkin's lymphomas, also referred to as B-cell NHLs, and Amevive (alefacept) for the treatment of adult patients with moderate-to-severe chronic plaque psoriasis who are candidates for systemic therapy or phototherapy. The Company also receives revenues from royalties on sales by its licensees of a number of products covered under patents that it controls including sales of Rituxan outside the United States. The Company was formed via the merger of Biogen, Inc. and IDEC Pharmaceuticals Corporation.

18.    TYSABRI, formerly referred as ANTEGREN, the first humanized monoclonal antibody approved for the treatment of MS, inhibits adhesion molecules on the surface of immune cells. Research suggests TYSABRI works by preventing immune cells from migrating from the bloodstream into the brain where they can cause inflammation and potentially damage nerve fibers and their insulation.

19.    Biogen Idec and Elan are collaborating equally on the development of TYSABRI in MS, Crohn's disease (CD), and rheumatoid arthritis (RA). Regulatory authorities in Canada and Australia have designated TYSABRI for Priority Review as a treatment for MS, and the European Medicines Agency (EMEA) is actively reviewing the application.

20.    In September 2004, the companies submitted a Marketing Authorisation Application (MAA) to the EMEA for CD based on Phase III studies. Another Phase III induction trial for CD is

ongoing. A Phase II trial is also underway to evaluate TYSABRI in RA. To date, more than 3,200

patients have received TYSABRI in clinical trials.

## Materially False And Misleading
## Statements Issued During The Class Period

21.    The Class Period starts on February 18, 2004. At that time, the Company issued a

press release with the headline "Biogen Idec and Elan Announce Intention to Submit Antegren® for

Approval for Multiple Sclerosis Based on One-year Data." Therein, the Company stated:

> Biogen Idec and Elan Corporation, plc today announced that they
> expect to submit to the U.S. Food and Drug Administration (FDA) an
> application for approval of ANTEGREN® (natalizumab) as a
> treatment for multiple sclerosis (MS). The companies expect to
> submit the filing mid-year 2004. The decision to file a Biologics
> License Application (BLA) was made after discussions with the FDA
> of one-year data from the two ongoing two-year Phase III trials in
> MS. The companies are committed to completing the two-year trials.
> To protect the integrity of the trials, the companies are not disclosing
> the one-year data at this time. Biogen Idec and Elan are collaborating
> equally on the development of natalizumab for MS, Crohn's disease,
> and rheumatoid arthritis.

22.    On June 28, 2004, Biogen issued a press release with the headline "FDA Designates

ANTEGREN® Biologics License Application for Priority Review as a Treatment for Multiple

Sclerosis." Therein, the Company stated:

> Biogen Idec and Elan Corporation, plc announced today that the
> Biologics License Application (BLA) for ANTEGREN®
> (natalizumab) has been designated for Priority Review and
> Accelerated Approval by the U.S. Food and Drug Administration
> (FDA) for the treatment of multiple sclerosis (MS). The next step in
> the process is action by the FDA on formal acceptance of the
> application, which occurs within 60 days of submission.
>
> The FDA grants Priority Review status to products that are
> considered to be potentially significant therapeutic advancements
> over existing therapies that address an unmet medical need. Based on

the FDA's designation of Priority Review for natalizumab in MS, the companies anticipate action by the Agency approximately six months from the submission date, rather than 10 months for a standard review. On May 25, 2004, the companies announced they had previously submitted the BLA for the approval of natalizumab for MS.

"We are pleased that the FDA has designated natalizumab for Priority Review," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "We look forward to continuing to work with the FDA throughout the review process to provide this potential new therapeutic to patients with MS."

"The Priority Review designation underscores the significant unmet medical need in the area of MS," said Lars Ekman, MD, executive vice president and president, Research & Development, Elan. "We believe natalizumab will offer a new approach to treating MS and will bring hope to patients living with this disease."

The BLA for natalizumab is being evaluated by the FDA under Accelerated Approval guidelines. This review will be based on one-year data from two ongoing Phase III trials. The companies are committed to completing these two-year trials. In order to protect the integrity of the trials, the companies are not disclosing the one-year data at this time.

23.    On July 26, 2004, Biogen issued a press release with the headline "FDA Accepts

Biologics License Application For ANTEGREN® for Multiple Sclerosis." Therein, the Company

stated:

Biogen Idec and Elan Corporation, plc announced today that the U.S. Food and Drug Administration (FDA) has formally accepted their Biologics License Application (BLA) for ANTEGREN® (natalizumab). In June 2004, the FDA designated natalizumab for Priority Review and Accelerated Approval for the treatment of multiple sclerosis (MS). Acceptance of a filing indicates that the FDA has determined that the application is complete and permits a substantive review.

The FDA grants Priority Review status to products that are considered to be potentially significant therapeutic advancements

over existing therapies that address an unmet medical need. Based on the FDA's designation of Priority Review for natalizumab in MS, the companies anticipate action by the Agency approximately six months from the submission date, rather than 10 months for a standard review. On May 25, 2004, the companies announced they had previously submitted the BLA for the approval of natalizumab for MS.

24.     On November 8, 2004, Biogen issued a press release with the headline "Antegren®

One-year Data from Phase III Affirm Study Showed Compelling Results in Meeting Primary

Endpoint in Multiple Sclerosis." Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that one-year data from the Phase III ANTEGREN® (natalizumab) AFFIRM trial met the primary endpoint of clinical relapse rate reduction. In this international study of 942 patients with relapsing-remitting multiple sclerosis (RRMS), natalizumab reduced the rate of relapses by 66 percent compared to placebo, a statistically significant result. All secondary endpoints were also met. These data were presented to investigators involved in the Phase III MS program for natalizumab at a meeting over the weekend. Natalizumab is currently under regulatory review for approval as a treatment for MS.
>
> The AFFIRM study is a two-year trial evaluating the effect of natalizumab on the progression of disability and the rate of relapses in MS. The primary endpoint of the one-year analysis was relapse rate. The companies anticipate that the two-year results will be available in the first half of 2005.
>
> Adverse events occurring in at least 5 percent of natalizumab-treated patients that were 2 percent more common than in placebo-treated patients included headache, fatigue and arthralgia. The overall incidence of infection was similar between the groups. Serious infections occurred in 1 percent of placebo-treated patients and 2 percent of natalizumab-treated patients. Serious hypersensitivity-like reactions occurred in approximately 1 percent of natalizumab-treated patients.
>
> "These data demonstrate that natalizumab dramatically reduced the rate of relapses at one year," said Burt Adelman, MD, executive vice

president, Development, Biogen Idec. "We believe natalizumab, with its novel mechanism of action, has the potential to be a significant step forward in the treatment of MS."

"Natalizumab has the potential to make a real difference in the lives of MS patients," said Lars Ekman, executive vice president and president, Research and Development, Elan. "We are working closely with regulatory authorities to make natalizumab available to patients in need as soon as we can."

The AFFIRM trial is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 942 patients evaluating the effect of natalizumab monotherapy on the progression of disability in MS and the rate of clinical relapses. Secondary endpoints at one year included the number of new or newly enlarging T2-hyperintense lesions, the number of gadolinium-enhancing lesions and the proportion of patients who were relapse free. To enroll, patients had to be diagnosed with a relapsing form of MS and had to have experienced at least one relapse in the previous year. Patients were randomized to receive a 300 mg IV infusion of natalizumab (n=627) or placebo (n=315) once a month.

"This was a rigorous, well-conducted clinical trial across 99 sites worldwide that yielded compelling one-year results," said Chris Polman, MD, PhD, lead investigator of the AFFIRM study, professor of neurology at Free University Medical Centre, and clinical and scientific director of the Multiple Sclerosis Centre at the VU Medical Centre, Amsterdam. "These data suggest that natalizumab may become a promising new treatment option for patients with MS and could help address a significant unmet need."

25.    On November 23, 2004, Biogen issued a press release with the headline "FDA Grants

Accelerated Approval of Tysabri® Formerly Antegren®, for the Treatment of Multiple Sclerosis."

Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that the U.S. Food and Drug Administration (FDA) has approved TYSABRI® (natalizumab), formerly referred to as ANTEGREN®, as treatment for relapsing forms of multiple sclerosis (MS) to reduce the frequency of clinical relapses. FDA granted Accelerated Approval for TYSABRI following Priority

Review based on one-year data from two Phase III studies, the AFFIRM monotherapy trial and the SENTINEL add-on trial with AVONEX® (Interferon beta-1a).

TYSABRI, the first humanized monoclonal antibody approved for the treatment of MS, inhibits adhesion molecules on the surface of immune cells. Research suggests TYSABRI works by preventing immune cells from migrating from the bloodstream into the brain where they can cause inflammation and potentially damage nerve fibers and their insulation.

"TYSABRI is a powerful and innovative therapy that offers new hope for hundreds of thousands of people living with MS," said James C. Mullen, chief executive officer, Biogen Idec. "We believe TYSABRI will revolutionize the treatment of MS and become the leading choice for patients and physicians."

"TYSABRI is a significant breakthrough for patients with MS," said Kelly Martin, president and chief executive officer, Elan. "The approval of TYSABRI, with its unique mechanism of action and new level of efficacy, has the potential to make a genuine difference in the lives of patients and families who struggle with the debilitating effects of this disease."

Results of the AFFIRM Monotherapy Trial

AFFIRM is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 942 patients conducted in 99 sites worldwide, in which patients were randomized to receive either a fixed 300 mg IV infusion dose of TYSABRI (n=627) or placebo (n=315) every four weeks. TYSABRI reduced the rate of clinical relapses by 66 percent relative to placebo (p<0.001), the primary endpoint at one-year. The annualized relapse rate was 0.25 for TYSABRI-treated patients versus 0.74 for placebo-treated patients.

AFFIRM also met all one-year secondary endpoints, including MRI measures. In the TYSABRI-treated group, 60 percent of patients developed no new or newly enlarging T2 hyperintense lesions compared to 22 percent of placebo-treated patients (p<0.001). On the one-year MRI scan, 96 percent of TYSABRI-treated patients had no gadolinium enhancing lesions compared to 68 percent of placebo-treated patients (p<0.001). The proportion of patients who

remained relapse free was 76 percent in the TYSABRI-treated group compared to 53 percent in the placebo-treated group (p<0.001).

Results of SENTINEL Add-on Study

Approval was also based on the results of another Phase III clinical trial, SENTINEL. SENTINEL is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 1,171 AVONEX-treated patients in 123 clinical trial sites worldwide.

In the SENTINEL trial, AVONEX-treated patients who continued to experience disease activity were randomized to add TYSABRI (n=589) or placebo (n=582) to their standard regimen.

SENTINEL achieved its one-year primary endpoint. The addition of TYSABRI to AVONEX resulted in a 54 percent reduction in the rate of clinical relapses over the effect of AVONEX alone (p<0.001). The annualized relapse rate was 0.36 for patients receiving TYSABRI when added to AVONEX versus 0.78 with AVONEX plus placebo.

SENTINEL also met all secondary endpoints, including MRI measures. In the group treated with TYSABRI plus AVONEX, 67 percent of patients developed no new or newly enlarging T2 hyperintense lesions compared to 40 percent in the AVONEX plus placebo group (p<0.001). On the one-year MRI scan, 96 percent of TYSABRI plus AVONEX-treated patients had no gadolinium-enhancing lesions compared to 76 percent of AVONEX plus placebo-treated patients (p<0.001). The proportion of patients who remained relapse-free was 67 percent in the TYSABRI plus AVONEX-treated group compared to 46 percent in the AVONEX plus placebo-treated group (p<0.001).

"I believe TYSABRI will be an important therapeutic advance for patients with relapsing MS," said Richard Rudick, MD, lead investigator of the SENTINEL trial and director, Mellen Center for Multiple Sclerosis, Cleveland Clinic Foundation. "Patients who have discontinued therapy, are newly diagnosed with MS, or have persistent active disease despite being on a current therapy will benefit from TYSABRI."

Safety

Common adverse events associated with TYSABRI include headache, fatigue, urinary tract infection, depression, lower respiratory tract infection, joint pain and abdominal discomfort. The rate of infection in both studies was approximately one per patient-year in both TYSABRI-treated patients and placebo-treated patients.

Serious infections occurred in 1.3 percent of placebo-treated patients and 2.1 percent of TYSABRI-treated patients. Serious infections included bacterial infections such as pneumonia and urinary tract infection, which responded appropriately to antibiotics. TYSABRI has been associated with hypersensitivity reactions, including serious systemic reactions, which occurred at an incidence of less than 1 percent of patients.

Immunogenicity

All biologics have the potential to induce patient antibodies. Analysis of the one-year Phase III MS trials indicate a low level of immunogenicity associated with TYSABRI. Patients were tested for antibodies every 12 weeks in the AFFIRM and SENTINEL trials. Antibodies were detected in approximately 10 percent of patients at least once during treatment, with 6 percent of patients remaining persistently positive. Persistently positive antibodies were associated with a substantial decrease in efficacy and an increase in certain infusion-related adverse events. Almost all patients who tested positive for antibodies did so within the first 12 weeks of treatment.

Two-year Results

AFFIRM and SENTINEL are two-year trials. Two-year results are anticipated beginning in the first half of 2005. Patients who complete these trials are eligible for enrollment in a long-term safety extension study.

"The MS community is pleased that the FDA approval of TYSABRI provides an additional treatment option for people with relapsing forms of MS. There are many people living with MS who may benefit from this different treatment approach," said Stephen C. Reingold, PhD, vice president for research, the National MS Society.

26.    On December 21, 2004, Biogen issued a press release with the headline "Biogen Idec

and Elan Announce Head-to-head Study Comparing Safety and Efficacy of Tysabri® to Rebif."

Therein, the Company stated:

> Biogen Idec and Elan announced today that they are initiating a head-to-head study comparing the safety and efficacy of TYSABRI® (natalizumab) to Rebif® (Interferon beta-1a)*. STARS (Study of TYSABRI Against Rebif in relapsing multiple Sclerosis), is a randomized, assessor-blinded, parallel group study that will enroll more than 1,000 multiple sclerosis (MS) patients in North and South America, Europe, Australia, Turkey and Israel.
>
> Patients who enroll in the study will be randomized to either treatment on Rebif, administered subcutaneously at 44 mcg three times per week, or treatment with TYSABRI, administered as a 300 mg IV infusion once every four weeks. The primary endpoint will compare the effect of TYSABRI to Rebif on the rate of clinical relapses. Secondary endpoints include analysis of the proportion of patients remaining relapse free, MRI brain scans, safety, tolerability and quality of life. To help ensure the objectivity of data emerging from STARS, relapses will be assessed and determined in a blinded fashion by an independent panel of experienced neurologists who are not participants in the study. The companies expect to enroll the first patient in STARS in the first quarter of 2005.
>
> "TYSABRI has shown very encouraging efficacy results and a favorable safety profile after one year, both as a monotherapy and as an add-on therapy to AVONEX® (Interferon beta-1a)," said Ludwig Kappos, MD, professor of neurology, Basel University, Switzerland, and member of STARS independent panel. "This head-to-head comparison with Rebif will provide important information that will further assist patients and physicians in making therapeutic choices."

27.    On February 7, 2005, the Company issued a press release announcing its fourth

quarter and full year 2004 results.  Therein, Biogen stated:

> Fourth Quarter & Full Year Highlights
>
> Total revenues in 2004 exceeded $2.20 billion vs. prior year $679 million (adjusted pro forma non-GAAP of $1.85 billion, an increase

of 19%), driven primarily by AVONEXÒ (Interferon beta-1a) sales up 21% (adjusted pro forma non-GAAP) to $1.42 billion and RITUXAN® (rituximab) co-promotion profits up 25% to $615 million.

Fourth quarter revenues were $586 million vs. prior year $300 million (adjusted pro forma non-GAAP of $491 million, an increase of 19%), driven primarily by AVONEX sales up 19% (adjusted pro forma non-GAAP) to $370 million and RITUXAN co-promotion profits up 31% to $170 million.

On a reported basis, calculated in accordance with U.S. generally accepted accounting principles (GAAP), full year earnings per share (EPS) were $0.13; excluding merger-related accounting impacts and other non-operating charges, adjusted pro forma non-GAAP EPS were $1.44. Fourth quarter GAAP earnings per share (EPS) were $0.14; excluding merger-related accounting impacts and other non-operating charges, adjusted pro forma non-GAAP EPS were $0.34.

In November, Biogen Idec and Elan Corporation, plc announced that the U.S. Food and Drug Administration (FDA) approved TYSABRI® (natalizumab), formerly referred to as ANTEGREN®, as treatment for relapsing forms of multiple sclerosis (MS) to reduce the frequency of clinical relapses.

James Mullen, Biogen Idec's Chief Executive Officer, commented, "Biogen Idec had a momentous year in 2004, highlighted by the approval of TYSABRI based on one-year data. Our major R&D programs experienced their most productive year and strong performance in AVONEX and RITUXAN fueled revenue growth of 19% to $2.2 billion. This puts us on track to meet our long-term goals of achieving approximately 15% top and 20% bottom line operating performance."

Financial Performance

On an adjusted non-GAAP basis, Biogen Idec reported net income of $121 million in the fourth quarter of 2004 (Q4 2003 adjusted pro forma non-GAAP: $91 million) and $518 million for the full year 2004 (2003 adjusted pro forma non-GAAP: $432 million). Adjusted non-GAAP EPS was $0.34 for the fourth quarter of 2004 (Q4 2003

adjusted pro forma non-GAAP: $0.25) and $1.44 for the full year 2004 (2003 adjusted pro forma non-GAAP: $1.22).

These adjustments are itemized on the attached reconciliation tables. Adjusted non-GAAP EPS and net income for the fourth quarter and full year of 2004 exclude merger-related accounting impacts, such as amortization of intangibles, impairment of intangibles, inventory step up, and other merger-related charges, and other non-operating charges. Adjusted pro forma non-GAAP EPS and net income for the fourth quarter and full year of 2003 include revenue and expenses from the former Biogen, Inc. from January 1 to November 12, 2003 (date of merger) but excludes similar merger-related accounting impacts excluded from fourth quarter and full year 2004 adjusted non-GAAP EPS and other non-operating charges of the former Biogen, Inc. and IDEC Pharmaceuticals Corporation.

On a reported basis, calculated in accordance with GAAP, Biogen Idec reported net income of $48 million (or EPS of $0.14) in the fourth quarter of 2004 and net income of $45 million (or EPS of $0.13) for the full year 2004. The difference between adjusted non-GAAP net income and EPS and GAAP net income and EPS in the fourth quarter and full year were primarily due to non-cash merger-related accounting impacts of $88 million and $656 million, respectively. Full year 2004 was also impacted by a $13 million write-down of certain investments.

Revenue Performance

Revenues from AVONEX, Biogen Idec's therapy for patients with relapsing forms of MS, increased 19% in the fourth quarter to $370 million (Q4 2003 adjusted pro forma non-GAAP: $310 million). Full year AVONEX sales increased 21% to $1.42 billion (2003 adjusted pro forma non-GAAP: $1.17 billion). In 2004, U.S. sales were $922 million and international sales were $495 million.

Revenues from AMEVIVE® (alefacept), Biogen Idec's treatment for moderate-to-severe chronic plaque psoriasis, were $10 million in the fourth quarter (Q4 2003 adjusted pro forma non-GAAP: $17 million) and $43 million for the full year (2003 adjusted pro forma non-GAAP: $40 million).

Revenues from ZEVALIN® (ibritumomab tiuxetan), Biogen Idec's radioimmunotherapeutic agent for relapsed or refractory low-grade,

follicular or transformed B-cell non-Hodgkin's lymphoma (NHL), were $8 million in the fourth quarter of 2004 (Q4 2003: $5 million) and $23 million for the full year (2003: $20 million).

Revenues from TYSABRI, Biogen Idec's therapy for patients with relapsing forms of MS, were $3 million in the fourth quarter.

Revenues for the fourth quarter of 2004 and full year 2004 included $170 million (Q4 2003: $130 million) and $615 million (2003: $493 million), respectively, from Biogen Idec's joint business arrangement with Genentech, Inc. related to RITUXAN, a treatment for certain B-cell non-Hodgkin's lymphomas that Biogen Idec co-promotes in the U.S. with Genentech. All U.S. sales of RITUXAN are recognized by Genentech, and Biogen Idec records its share of the pretax co-promotion profits on a quarterly basis. U.S. net sales of RITUXAN were $429 million in the fourth quarter (Q4 2003: $369 million) and $1.57 billion for the full year (2003: $1.36 billion), as reported by Genentech.

Royalties were $25 million in the fourth quarter (Q4 2003 adjusted pro forma non-GAAP: $27 million) and $98 million for the full year (2003 adjusted pro forma non-GAAP: $127 million).

Financial Guidance

Biogen Idec today reaffirmed its long-term goal of achieving 15% compound annual revenue growth, and approximately 20% compound annual earnings per share (adjusted pro forma non-GAAP) growth through 2007.

Given the launch investments behind TYSABRI, the Company is anticipating low double-digit growth for revenue and adjusted non-GAAP earnings in 2005. On this non-GAAP basis, the Company expects operating expenses to grow 12-14% over 2004 levels and its effective tax rate for 2005 to be in the range of 31-33%. As a result, the Company estimates that its 2005 non-GAAP earnings per share will be in the range of $1.60 to the low $1.70's.

The Company anticipates that 2005 capital expenditures will be in the range of $400 - $475 million. A significant portion of these expenditures will be directed towards the completion of the Oceanside manufacturing facility and the construction of a large-scale manufacturing facility in Denmark.

28.    On February 17, 2005, Biogen issued a press release with the headline "Tysabri®

Two-year Monotherapy Trial Demonstrates Significant Impact on Disability Progression and Relapse

Rate in Multiple Sclerosis." Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that the Phase III TYSABRI® (natalizumab) AFFIRM monotherapy trial achieved the two-year primary endpoint of slowing the progression of disability in patients with relapsing forms of multiple sclerosis (MS). TYSABRI treatment led to a 42 percent reduction in the risk of disability progression relative to placebo. These data also demonstrated a 67 percent reduction in the rate of clinical relapses over two years, which was sustained and consistent with the previously reported one-year results.
>
> Other data from AFFIRM at two years, including MRI measures and immunogenicity were similar to previously reported results.
>
> The adverse event profile at two years was also consistent with previously reported results. Common events included headache, fatigue, urinary tract infection, depression, lower respiratory tract infection, limb and joint pain, and pharyngitis. The incidence of infections in TYSABRI-treated and placebo-treated patients was similar. Serious infections occurred in 3.2 percent and 2.6 percent of patients, respectively. These included bacterial infections such as pneumonia and urinary tract infection, which responded appropriately to antibiotics. TYSABRI has also been associated with hypersensitivity reactions, including serious systemic reactions that occurred at an incidence of less than 1 percent of patients.
>
> "TYSABRI, with its significant effect on slowing the progression of disability, offers new hope for patients with MS," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "With these data, we gain a more complete understanding of the broad therapeutic benefit of TYSABRI in MS."
>
> "Results from the two-year monotherapy clinical trial mark a major milestone in the treatment of MS. These two-year data strengthen our belief that TYSABRI will become the leading therapy for MS patients," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan.

29.     The statements contained in ¶¶ 21-28 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that TYSABRI posed serious immune-system side effects; (2) that TYSABRI, like other MS drugs, made patients susceptible to progressive multifocal leukoencephalopathy ("PML") by changing the way certain white blood cells function thereby allowing PML, a normally dormant virus, to run rampant within the human body; (3) that defendants knew and/or recklessly disregarded documented facts that MS drugs can cause greater incidents of PML to occur; and (4) that defendants concealed these facts in order to fast track TYSABRI for FDA approval so that they could reap the financial benefits from the sales of the drug.

## The Truth Begins to Emerge

30.     On February 28, 2005, before the market opened, Biogen issued the following press release:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today a voluntary suspension in the marketing of TYSABRI® (natalizumab), a treatment for multiple sclerosis (MS). The companies are suspending supply of TYSABRI from commercial distribution and physicians should suspend dosing of TYSABRI until further notification. In addition, the companies have suspended dosing in all clinical trials.

> This decision is based on very recent reports of two serious adverse events that have occurred in patients treated with TYSABRI in combination with AVONEX® (Interferon beta-1a) in clinical trials. These events involve one fatal, confirmed case and one suspected case of progressive multifocal leukoencephalopathy (PML), a rare and frequently fatal, demyelinating disease of the central nervous system. Both patients received more than two years of TYSABRI therapy in combination with AVONEX.

The companies' actions have been taken in consultation with U.S. Food and Drug Administration (FDA). Worldwide regulatory agencies are being kept informed.

The companies will work with clinical investigators to evaluate TYSABRI-treated patients and will consult with leading experts to better understand the possible risk of PML. The outcome of these evaluations will be used to determine possible re-initiation of dosing in clinical trials and future commercial availability.

"Our ongoing commitment to MS patients has led us to take these steps," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "Because we believe in the promising therapeutic benefit of TYSABRI, we are working to evaluate this situation thoroughly and expeditiously. While we work through this matter, we must place patient safety above all other considerations."

"We are working with leading experts and regulatory agencies to responsibly investigate these events and to develop the appropriate path forward," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan. "Our primary concern is for the safety of patients."

In total, approximately 3,000 patients have been treated with TYSABRI in clinical trials of MS, Crohn's disease, and rheumatoid arthritis. To date, the companies have received no reports of PML in MS patients receiving TYSABRI monotherapy or in patients with Crohn's disease or rheumatoid arthritis in TYSABRI clinical trials. Biogen Idec has received no reports of PML in patients treated with AVONEX alone, a product that has been on the market since 1996.

31.    News of this shocked the market.  Shares of Biogen fell $28.63 per share, or 42.44 percent, to close at $38.65 on unusually high trading volume.

## UNDISCLOSED ADVERSE FACTS

32.    The market for Biogen's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Biogen's securities traded at artificially inflated prices during the Class Period.  Plaintiff

and other members of the Class purchased or otherwise acquired Biogen securities relying upon the integrity of the market price of Biogen's securities and market information relating to Biogen, and have been damaged thereby.

33.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Biogen's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

34.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Biogen's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Biogen and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

35.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Biogen, their control over, and/or receipt and/or modification of Biogen allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Biogen, participated in the fraudulent scheme alleged herein.

36.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

37.     Additionally, Company insiders took advantage of the Biogen's artificially inflated stock price by disposing of *786,244* shares of Company stock for *$37,395,198.53* in proceeds as evidenced below:

| Name | Date | Shares/Price | Proceeds |
|------|------|--------------|----------|
| Thomas J. Bucknum | 02/18/2005<br>11/30/2004<br>05/25/2004 | 89,700 @ $67.124<br>33,900 @ $59.000<br>30,000 @ $62.500<br>*Total Shares Sold:*<br>*153,600* | $6,021,022.80<br>$2,000,100.00<br>$1,875,000.00<br>*Gross Proceeds:*<br>*$9,896,122.80* |
| William H. Rastetter | 02/15/2005<br>05/24/2004<br>05/04/2004 | 120,313 @ $67.510<br>29,081 @ $62.505<br>105,000 @ $58.680<br>25,000 @ $58.830<br>*Total Shares Sold:*<br>*279,394* | $8,122,330.63<br>$1,817,707.90<br>$6,161,400.00<br>$1,470,750.00<br>*Gross Proceeds:*<br>*$17,572,188.53* |
| Robert W. Pangia | 02/14/2005<br>05/05/2004 | 15,750 @ $67.000<br>29,000 @ $58.550<br>*Total Shares Sold:*<br>*44,750* | $1,055,250.00<br>$1,697,950.00<br>*Gross Proceeds:*<br>*$2,753,200.00* |
| Lynn Schenk | 02/18/2004 | 10,500 @ $52.000<br>112,500 @ $50.000<br>*Total Shares Sold:*<br>*123,000* | $546,000.00<br>$5,625,000.00<br>*Gross Proceeds:*<br>*$6,171,000.00* |

| James C. Mullen | 01/24/2005 | 5,500 @ $62.968 | $346,324.00 |
| | 01/18/2005 | 5,500 @ $67.400 | $370,700.00 |
| | 01/10/2005 | 5,500 @ $65.944 | $362,692.00 |
| | 01/03/2005 | 5,500 @ $67.000 | $368,500.00 |
| | 12/27/2004 | 5,500 @ $65.898 | $362,439.00 |
| | 12/20/2004 | 5,500 @ $65.008 | $357,544.00 |
| | 12/13/2004 | 4,500 @ $65.680 | $295,560.00 |
| | 12/06/2004 | 5,500 @ $60.677 | $333,723.50 |
| | 11/29/2004 | 4,500 @ $58.527 | $263,371.50 |
| | 11/15/2004 | 4,500 @ $58.670 | $264,015.00 |
| | 11/08/2004 | 5,500 @ $61.014 | $335,577.00 |
| | 11/03/2004 | 1,000 @ $60.002 | $60,002.00 |
| | 11/01/2004 | 4,500 @ $57.794 | $260,073.00 |
| | 10/28/2004 | 1,000 @ $60.000 | $60,000.00 |
| | 10/25/2004 | 4,500 @ $55.869 | $251,410.50 |
| | 10/18/2004 | 4,500 @ $57.500 | $258,750.00 |
| | 10/11/2004 | 5,500 @ $59.950 | $329,725.00 |
| | 10/04/2004 | 5,500 @ $62.380 | $343,090.00 |
| | 09/27/2004 | 5,500 @ $59.500 | $327,250.00 |
| | 09/20/2004 | 5,500 @ $61.580 | $228,690.00 |
| | 09/13/2004 | 5,500 @ $61.743 | $339,586.50 |
| | 09/07/2004 | 5,500 @ $60.700 | $33,850.00 |
| | 08/30/2004 | 5,500 @ $59.387 | $326,628.50 |
| | 08/25/2004 | 1,000 @ $60.003 | $60,003.00 |
| | 08/23/2004 | 4,500 @ $59.607 | $268,231.50 |
| | 08/18/2004 | 1,000 @ $60.000 | $60,000.00 |
| | 08/16/2004 | 4,500 @ $58.420 | $262,890.00 |
| | 08/10/2004 | 4,500 @ $55.895 | $251,527.50 |
| | 08/02/2004 | 4,500 @ $58.200 | $261,900.00 |
| | 07/30/2004 | 1,000 @ $59.859 | $59,859.00 |
| | 07/26/2004 | 3,000 @ $53.350 | $160,050.00 |
| | 07/19/2004 | 4,500 @ $57.899 | $260,545.50 |
| | | 1,500 @ $53.506 | $80,259.00 |
| | 07/13/2004 | 5,500 @ $60.482 | $332,651.00 |
| | 07/06/2004 | 5,500 @ $61.984 | $340,912.00 |
| | 06/29/2004 | 5,500 @ $63.040 | $346,720.00 |
| | 06/24/2004 | 1,000 @ $60.094 | $60,094.00 |
| | 06/21/2004 | 4,500 @ $57.522 | $258,849.00 |
| | 06/14/2004 | 5,500 @ $59.960 | $329,780.00 |
| | 06/07/2004 | 5,500 @ $61.650 | $339,075.00 |
| | 06/01/2004 | 5,500 @ $61.820 | $340,010.00 |
| | 05/24/2004 | 5,500 @ $61.264 | $336,952.00 |

| | | *Total Shares Sold:* <br> *185,500* | *Gross Proceeds:* <br> *$10,898,810* |
|---|---|---|---|
| | | *Total Shares Sold by* <br> *Insiders:* <br> *786,244* | *Gross Proceeds from* <br> *Insider Trades:* <br> *$37,395,198.53* |

(Emphasis added.)

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

38.     At all relevant times, the market for Biogen securities was an efficient market for the following reasons, among others:

(a)  Biogen stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, Biogen filed periodic public reports with the United States Securities and Exchange Commission ("SEC") and the NASDAQ;

(c)  Biogen  regularly communicated with public investors _via_ established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  Biogen was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

39.     As a result of the foregoing, the market for Biogen securities promptly digested current information regarding Biogen from all publicly-available sources and reflected such

information in Biogen stock price. Under these circumstances, all purchasers of Biogen securities during the Class Period suffered similar injury through their purchase of Biogen securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

40.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Biogen who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

41.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Biogen securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

43.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Biogen securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

44.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Biogen as specified herein.

45.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Biogen value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Biogen and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Biogen securities during the Class Period.

46.      Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

47.      The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Biogen's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

48.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Biogen securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Biogen's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Biogen securities during the Class Period at artificially high prices and were damaged thereby.

49.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Biogen was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Biogen securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

50.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     The Individual Defendants acted as controlling persons of Biogen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

55.    As set forth above, Biogen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 10, 2005

Respectfully submitted,

**GILMAN AND PASTOR, LLP**

David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Telephone: 781/231-7850
Facsimile: 781/231-7840

**MURRAY, FRANK & SAILER LLP**
Eric J. Belfi
Aaron D. Patton
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone: 212/682-1818
Facsimile: 212/682-1892

**GLANCY, BINKOW & GOLDBERG LLP**
Michael Goldberg
Dale MacDiarmid
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: 310/201-9150
Facsimile: 310/201-9160

**Attorneys for Plaintiff**

# CERTIFICATION

I, Cary Grill, do hereby certify that:

    1. I have reviewed the complaint and have authorized its filing.

    2. I purchased securities of Biogen Idec Inc., which are the subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

    3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

    4. In the three years prior to this certification, I have applied to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions:

NA

    5. During the Class Period, I engaged in the following transactions:

TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| Buy | 5/24/2004 | 10 | 62.34 |

***For additional space, continue transactions on page 2.

    6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

    7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

    8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 3/7/ 2005.       Signature _____

Cary Grill

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

CARY GRILL, Individually and On Behalf of All Others Similarly Situated

## DEFENDANTS

BIOGEN IDEC INC., WILLIAM RASTETTER, and JAMES MULLEN

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Essex County (NJ)
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
David Pastor, Gilman and Pastor, LLP
999 Broadway, Suite 500, Saugus, MA 01906
(781) 231-7850

ATTORNEYS (IF KNOWN)

05 104 3 RCL

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| | **PERSONAL INJURY**<br>☐ 362 Personal Injury – Med Malpractice<br>☐ 365 Personal Injury – Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | |
| **REAL PROPERTY** | **PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 730 Labor/Mgmt Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl Ret Inc Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS – Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Action for securities fraud under 15 U.S.C. § 78j(b).

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S)   (See instructions)
IF ANY

JUDGE Reginald C. Lindsay      DOCKET NUMBER 05 10400 RCL

DATE
March 10, 2005

SIGNATURE OF ATTORNEY OF RECORD
David Past

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)  Grill v. Biogen IDEC, Inc., et al.

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☒  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
         740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       for patent, trademark or copyright cases

☐  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
         315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
         380, 385, 450, 891.

☐  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
         690, 810, 861-865, 870, 871, 875, 900.

☐  V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    Charles Brown v. Biogen IDEC, Inc., et al., C.A. No. 05-10400 RCL

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

    YES ☐   NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

    YES ☐   NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

    YES ☐   NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

    YES ☐   NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

    YES ☒   NO ☐

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division ☒   Central Division ☐   Western Division ☐

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division ☐   Central Division ☐   Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

    YES ☐   NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  David Pastor, Gilman and Pastor, LLP

ADDRESS  999 Broadway, Suite 500, Saugus, MA 01906

TELEPHONE NO.  (781) 231-7850

05-10453

(Coversheetlocal.wpd - 10/17/02)