## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS (BOSTON)

| | | |
|---|---|---|
| CHARLES BROWN, Individually and On Behalf of All Others Similarly Situated, | : | 1:05-cv-10400 (RCL) |
| Plaintiff, | : | |
| vs. | : | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER, and JAMES MULLEN, | : | |
| Defendants. | : | |
| CARY GRILL, Individually and On Behalf of All Others Similarly Situated, | : | 1:05-cv-10453 (RCL) |
| Plaintiff, | : | |
| vs. | : | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER and JAMES MULLEN, | : | |
| Defendants. | : | |
| ROCHELLE LOBEL, Individually and On Behalf of All Others Similarly Situated, | : | 1:05-cv-10801 (RCL) |
| Plaintiff, | : | |
| vs. | : | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER and JAMES MULLEN, | : | |
| Defendants. | : | |

**ASSENTED-TO MOTION OF THE BIOGEN INSTITUTIONAL INVESTOR GROUP
FOR LEAVE TO FILE REPLY BRIEF AND REPLY AFFIDAVIT
OF NEIL KAZAROSS IN FURTHER SUPPORT OF ITS MOTION FOR
CONSOLIDATION, APPOINTMENT OF LEAD PLAINTIFF,
AND APPROVAL OF LEAD PLAINTIFF'S SELECTION
OF CO-LEAD COUNSEL AND LIAISON COUNSEL**

The New Jersey Carpenters Pension and Annuity Funds, Folksam Asset Management, Third Millennium Trading, LLP, the Deerfield Beach Non-Uniformed Municipal Employees Retirement Plan and the Plumbers and Pipefitters Local No. 520 Pension Fund (collectively, the "Biogen Institutional Investor Group" or "Movants"), by their counsel, hereby move this Court for leave to file the attached Reply Memorandum of Law in Further Support of the Motion of the Biogen Institutional Investor Group for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Co-Lead and Liaison Counsel ("Reply"), as well as the Reply Affidavit of Neil Kazaross in Further Support of the Motion of the Biogen Institutional Investor Group for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Co-Lead and Liaison Counsel and in Opposition to the Competing Motions, which is also attached hereto.  In support of its Motion, the Biogen Institutional Investor Group states that the matters raised in this Reply are relevant to the issues before the Court and respond specifically to matters raised in opposition to the Movants' pending motion for appointment as lead plaintiff and approval of lead plaintiff's selection of co-lead and liaison counsel.  The Reply Brief and Reply Affidavit will aid the Court in its consideration and adjudication of Movants' motion.

DATED: June 1, 2005                                    Respectfully submitted,


                                                       **MOULTON & GANS, P.C.**


                                                       By: /s/ Nancy Freeman Gans
                                                       Nancy Freeman Gans, BBO #184540
                                                       33 Broad Street, Suite 1100
                                                       Boston, MA  02109
                                                       Telephone:  (617) 369-7979

                                                       *Proposed Liaison Counsel*

**MILBERG WEISS BERSHAD
    & SCHULMAN LLP**
Steven G. Schulman
Anita B. Kartalopoulos
Peter E. Seidman
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci
Stephen D. Oestreich
Robert N. Cappucci
299 Park Avenue
New York, NY  10171
(212) 894-7200

*Proposed Co-Lead Counsel*

## LOCAL RULE 7.1 CERTIFICATE

I, Nancy Freeman Gans, hereby certify that on May 26, 2005, I consulted with Jeffrey C. Block, Esquire, of Berman Devalerio Pease Tabacco Burt & Pucillo, counsel for the Louisiana School Employees' Retirement System and Municipal Policy Employees' Retirement System of Louisiana;; Theodore Hess-Mahon, Esquire of Shapiro, Haber & Urmy LLP, counsel for the London Pensions Fund Authority and National Elevator Industry Pension Fund; and David Pastor, Esquire, counsel for Rochelle Lobel, concerning the within motion.  All assent to this motion.  I also notified by telephone Matthew J. Matule, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for all Defendants, concerning the within Motion for Leave to File Reply Memorandum of Law in Further Support of the Motion of the Biogen Institutional Investor Group for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Co-Lead and Liaison Counsel.

/s/ Nancy Freeman Gans
Nancy Freeman Gans

## CERTIFICATE OF SERVICE

I, Andrei Rado, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Andrei Rado
Andrei Rado

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS (BOSTON)

| | |
|---|---|
| CHARLES BROWN, Individually and On Behalf of All Others Similarly Situated, | 1:05-cv-10400 (RCL) |
| Plaintiff, | |
| vs. | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER, and JAMES MULLEN, | |
| Defendants. | |
| CARY GRILL, Individually and On Behalf of All Others Similarly Situated, | 1:05-cv-10453 (RCL) |
| Plaintiff, | |
| vs. | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER and JAMES MULLEN, | |
| Defendants. | |
| ROCHELLE LOBEL, Individually and On Behalf of All Others Similarly Situated, | 1:05-cv-10801 (RCL) |
| Plaintiff, | |
| vs. | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER and JAMES MULLEN, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE BIOGEN INSTITUTIONAL INVESTOR GROUP FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF CO-LEAD AND LIAISON COUNSEL**

## I.     PRELIMINARY STATEMENT

The New Jersey Carpenters Pension and Annuity Funds, Folksam Asset Management, Third Millennium Trading LLP, the Deerfield Beach Non-Uniformed Municipal Employees Retirement Plan, the Plumbers and Pipefitters Local No. 520 Pension Fund and Horatio Capital, LLC (collectively, the "Biogen Institutional Investor Group" or "Movants") respectfully submit this Reply Memorandum in further support of their motion for: (1) consolidation of the above-captioned actions (the "Actions") pursuant to Fed. R. Civ. P. 42(a); (2) appointment as Lead Plaintiff in the Actions pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4; and (3) approval of their selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Milberg Weiss Bershad & Schulman LLP ("Milberg Weiss") as Co-Lead Counsel, and Moulton and Gans, P.C. ("Moulton & Gans") as Liaison Counsel pursuant to the PSLRA.  This memorandum addresses the arguments raised against the Movants in the Memorandum In Further Support Of The Motion Of The London Pension Fund Authority And National Elevator Industry Pension Fund (collectively, the "London Group") For Consolidation, Appointment As Lead Plaintiff And For Approval Of Selection Of Lead And Liaison Counsel And In Opposition To The Competing Motions ("London Group Opposition").[1]

The London Group claims that the Biogen Institutional Investor Group should not be appointed as Lead Plaintiff because: (i) it did not provide necessary transactional data to support the loss figure for certain of its members; (ii) it is rendered inadequate and atypical due to the status of Third Millennium Trading LLP ("Third Millennium" or the "Firm") as a purported market maker and options trader; (iii) Third Millennium allegedly suffers from an irreconcilable

---

[1] The Biogen Institutional Investor Group does not address the lead plaintiff motions of the Louisiana School Employees Retirement System and Municipal Police Employees' Retirement System of Louisiana or Rochelle Lobel because they did not file any opposition briefs and thus appear to have abandoned their motions.  In any event, these competing movants have claimed smaller losses than the Biogen Institutional Investor Group and, therefore, their motions should not be considered.

conflict of interest; and (iv) it is claimed that the Biogen Institutional Investor Group is too unwieldy to serve as Lead Plaintiff.  As addressed below, each of these arguments is meritless.

The London Group fails to rebut the presumption that the Biogen Institutional Investor Group is the presumptively most adequate lead plaintiff.  In order to rebut that presumption, competing movants must do more than speculate that the Biogen Institutional Investor Group *might not* adequately represent the Class.  Competing movants must offer "proof" to rebut the presumption of adequacy. 15 U.S.C. § 78-(a)(3)(B)(iii)(II); *see also Gluck v. CellStar Corp.*, 976 F. Supp. 542, 547 (N.D. Tex. 1997) ("there is of course, a marked difference between affirmatively demonstrating that [the presumptively most adequate plaintiff] is not an adequate representative or is subject to unique defenses and simply claiming that [the plaintiff] might be subject to such arguments in the future.").  Here, the London Group has failed to meet this burden and, indeed, is wrong about the facts that form the basis for its inapplicable legal arguments, such as the incorrect claim that Third Millenium is market maker in Biogen securities.

The Biogen Institutional Investor Group demonstrates herein that: it has the largest financial interest of any lead plaintiff movant; it has provided reliable transactional data necessary to support its loss figure; Third Millennium is an adequate and typical Class member since it is neither a market maker for Biogen Idec, Inc. ("Biogen") common stock, nor is it the designated market maker in Biogen options, which, in any event, are irrelevant here; Third Millennium is an adequate and typical class member because it relied upon generally available market news in making its investment decisions; Third Millennium does not have a relationship with Merrill Lynch & Co., Inc. ("Merrill Lynch") that would influence the litigation in any

2

respect; and the Biogen Institutional Investor Group is a proper group under the PSLRA, with a cohesive structure.

## II.     ARGUMENT

### A.     The Biogen Institutional Investor Group Has The Largest Financial Interest Of Any Lead Plaintiff Movant

With losses in excess of $4.9 million, the Biogen Institutional Investor Group has the largest financial interest of any lead plaintiff movant here.  The PSLRA requires the Court to determine who among the movants is the "most adequate plaintiff" for the task of prosecuting the class action.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  The statute then provides three factors a court must consider to help identify the "most adequate plaintiff."  *See id*.  Specifically, the statute creates:

> a rebuttable presumption that the most adequate plaintiff is the person or group of persons who (i) has either filed the complaint or made a motion in response to notice given, (ii) has the largest financial interest in the relief sought by the class, (iii) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  The first and third factors are nonexclusive, in that more than one class member may satisfy their requirements.  The second factor, however, is exclusive.  There can only be a single movant with the largest financial stake in the litigation.  *See In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 43 (D. Mass. 2001).

The Biogen Institutional Investor Group is the most adequate lead plaintiff due to its losses of more than $4.9 million in connection with its purchase of thousands of Biogen shares during the Class Period.  The following chart sets forth the reported losses of all lead plaintiff movants:

| | Lead Plaintiff Movants | Loss |
|---|---|---|
| 1 | **Biogen Institutional Investor Group** | **$4,964,110.75** |
| | New Jersey Carpenters Pension & Annuity Fund | $279,715.06 |
| | Folksom Asset Management | $857,697.61 |
| | ***Third Millennium Trading, LLP*** | ***$3,068,480.56*** |
| | Deerfield Beach Non-Uniformed Municipal Employees Retirement Plan | $130,680.96 |
| | Plumbers and Pipefitters Local No. 520 Pension Fund | $111,467.73 |
| | Horatio Capital, LLC | $516,068.83 |
| 2 | **London Pension Funds Authority / National Elevator Industry Pension Fund** | **$3,758,992.74** |
| | London Pension Funds Authority | $2,055,785.11 |
| | National Elevator Industry Pension Fund | $1,703,207.63 |
| 3 | **Louisiana School Employees' Retirement System and Municipal Police Employees' Retirement System of Louisiana** | **$1,047,986.13** |
| | Louisiana School Employees' Retirement System | $575,409.30 |
| | Municipal Police Employees' Retirement System of Louisiana | $472,576.83 |
| 4 | **Rochelle Lobell** | **$20,904.50** |

The Biogen Institutional Investor Group clearly represents the largest financial interest of all other movants in the Actions. Its loss of over $4.9 million is:

- more than ***$1 million higher*** than that of the movant with the next largest loss;

- almost ***five times*** that of the third highest movant; and

- almost ***two hundred-fifty (250) times*** that of the smallest movant.

 Furthermore, with losses of over $3 million, Third Millennium suffered the largest single loss of any individual member of any moving group. Therefore, the Biogen Institutional Investor Group is the only movant that meets the "largest financial interest" requirement. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). For this reason, the motions of the other movants should be denied.[2]

---

[2] We note that the London Group's counsel has taken the position, in a recent Lead Plaintiff motion filed in the Western District of Washington, that foreign institutions should not be appointed as Lead Plaintiff because doing so "will likely subject the class to unique jurisdictional attacks" and because a European movant is too far away to

**B.    The Biogen Institutional Investor Group Has Provided Reliable
Transactional Data Necessary To Support Its Loss Figure**

Despite the London Group's contentions, Third Millennium and Horatio Capital, LLC

("Horatio") have each submitted proper transactional data.

**1.    Third Millennium Has Provided All Relevant
Transactions In Biogen Securities**

Pursuant to the PSLRA, the plaintiff certification should "set[] forth all of the

transactions of the plaintiff ***in the security that is the subject of the complaint*** during the class

period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv) (emphasis added). The Biogen

Institutional Investor Group has submitted Third Millennium's certification, which provided a

listing of all of its "transactions during the proposed class period in Biogen, IDEC, Inc.

securities, that are the subject of this litigation."  *See* Declaration of Nancy Freeman Gans

submitted with motion at Exhibit B (attaching certifications). Transactions in options were not

included because options are not "the security that is the subject of the complaint[s]." 15 U.S.C.

§ 78u-4(a)(2)(A)(iv).

The London Group's contention is that "securities" includes options and argue that Third

Millenium must have traded Biogen options and that these should have been reflected in its

certification. However, as the London Group's quotes from the *Biogen* Actions show, each of the

actions defines the class as "purchasers of the publicly traded securities ***of Biogen***". *See* London

Group Opp. Mem. at 8, n.6 (emphasis added). Stock options are *not* securities issued by Biogen.

---

make an effective Lead Plaintiff. *See* Lead Plaintiff Opp. Brief at 10-11 in *F.L. Heywood v. Cell Therapeutics, Inc.*
No. 05-CV-00396-RSM (W.D. Wash.) (the brief is attached as Exhibit A hereto). The Biogen Institutional Investor
Group does not agree with this argument, which lacks merit.  Presumably, the London Group agrees that this
argument lacks merit.  *See, e.g., In re Goodyear Tire & Rubber Co. Sec. Litig.,* No. 5:03CV2166, 2004 U.S. Dist.
LEXIS 27043, at *25 (N.D. Ohio May 12, 2004) ("[T]o exclude a foreign investor from lead plaintiff status on
nationality grounds would defy the realities and complexities of today's increasingly global economy."). However, it
is noteworthy here that *counsel* for the London Pensions Fund has asserted elsewhere that European institutional
investors may be atypical and make ineffective Lead Plaintiffs.

Options are contracts typically issued by writers of options, on an organized exchange, not by the company that issues the underlying common stock of which the stock option is merely a "derivative" security. Accordingly, options are plainly not a part of the action as defined by the complaints.

Moreover, until the filing of the London Group's Opposition, common stock was the only Biogen security mentioned in the allegations in this case (or, in fact, in any other related document). Options were not specified in any complaint, lead plaintiff motion, class action notice or certification. The certifications attached to the three complaints filed in this matter, *Brown v. Biogen Idec, Inc.,* No. 05-CV-10400 (RCL) (D. Mass. filed Mar. 2, 2005), *Grill v. Biogen Idec, Inc.,* No. 05-CV-10453 (RCL) (D. Mass. filed Mar. 10, 2005), and *Lobel v. Biogen Idec, Inc.*, No. 05-CV-10801 (RCL) (D. Mass. filed Apr. 21, 2005), included only common stock, and the plaintiffs are purchasers of common stock only. Moreover, the typical language used in options trading of "buying calls" or "selling puts," which reflect a "bullish" position on the stock, consistent with the theory of the Actions, is not mentioned in any filing. Sales of puts, moreover, cannot be incorporated by the term "purchasers of securities," which defines the class in each of the complaints. Therefore, transactional information regarding purchases and sales of options is irrelevant and not required by the PSLRA. *See Marine Bank v. Weaver*, 455 U.S. 551 (1982) (stating that the broad statutory definition of securities in the Securities Exchange Act of 1934 is preceded by the instructive statement that "the terms mentioned are not to be considered securities if 'the context otherwise requires . . .'"). Because only common stock was referenced in the complaints, the context dictates that "securities" does not include options and that options are not currently a part of the litigation.

In any event, even if transactional information regarding options trading is relevant, Third Millennium transactions in options, yielding a profit of approximately $500,000, did not materially impact its losses on Biogen common stock. *See* Reply Affidavit of Neil Kazaross In Further Support Of The Motion Of The Biogen Institutional Investor Group For Consolidation, Appointment As Lead Plaintiff, And Approval Of Lead Plaintiff's Selection Of Co-Lead And Liaison Counsel And In Opposition To The Competing Motions ("Kazaross Aff."), ¶ 8. Indeed, even including Third Millennium's options transactions, it still suffered a far greater loss than any other lead plaintiff movant. Accordingly, the Biogen Institutional Investor Group should be appointed Lead Plaintiff.[3]

### 2.    Horatio Has Submitted its Transactional Data

Due to time constraints, specific transactional data for Horatio was not provided at the time its motion was filed. That data was submitted together with its certification in the opposition memorandum. In *In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 436 (E.D. Va. 2000), relied on by The London Group, a movant was disqualified for, among other things, "submit[ing] a conclusory affidavit and a collection of indecipherable financial statements that purported to support the affidavit's conclusion [of its financial interest]". In *MicroStrategy*, and the other two cases relied on by the London Group for this point, the movant at issue did not submit the

---

[3] In its Opposition, the London Group points to certain Third Millennium transactions that were apparently made outside the trading ranges on the date of the respective trades. Although these transactions may be the result of options, they are irrelevant to the issue of whether Third Millennium properly submitted its transaction data. To the extent these transactions are the result of options, they only further reinforce Third Millennium's reliance on the false and misleading statements issued by defendants during the Class Period, the integrity of the market and Third Millennium's assumption that the disclosures for Biogen securities during the Class Period provided an accurate basis on which to make its investment decisions. *See infra* at 8-10.

requisite financial data at all; it was not that the information was submitted after the motion was filed. Horatio's transactional data is clear and accurately sets forth its loss.[4]

C.    **The Biogen Institutional Investor Group Is An Adequate And Typical Class Member And Can Effectively Serve As Lead Plaintiff**

In addition to suffering the largest financial loss, the Biogen Institutional Investor Group is an adequate and typical Class member.  Specifically, the Biogen Institutional Investor Group satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure for purposes of lead plaintiff appointment.  Under the PSLRA, "[t]he Rule 23 inquiry. . . is less stringent than the inquiry the rule otherwise requires," and at the Lead Plaintiff stage, "a plaintiff need only make a 'preliminary showing' that the Rule's typicality and adequacy requirements have been satisfied. *See Fitzgerald v. Citigroup Inc.*, Case No. 03 Civ. 4305 (DAB), 2004 U.S. Dist. LEXIS 5066, at *8-10 (S.D.N.Y. Mar. 19, 2004), quoting *Fischler v. Amsouth Bancorporation*, No. 96-1567, 1997 U.S. Dist. LEXIS 2875, at *7-8 (M.D. Fla. Feb. 6, 1997) ("[a] wide-ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for consideration for a motion for class certification").

1.    **Third Millennium Relies On The Integrity Of The Market And Does Not Employ Unique, Atypical Trading Strategies**

The London Group argues that Third Millennium employs trading strategies that are not used by most investors and that, therefore, it is atypical and subject to unique defenses because its purchases are not made in reliance on defendants' fraudulent statements. This argument fails because in securities class actions reliance is *presumed* pursuant to the Fraud-On-The-Market theory, which assumes that all publicly available information about a company is reflected in its stock price. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (reliance presumed "where

---

[4] In addition, the financial interest of the Biogen Institutional Investor Group is larger than that of  the London Group even without including the financial interest of Horatio Capital.

materially misleading statements have been disseminated into an impersonal, well-developed

market for securities.").  Indeed, in a decision relying on numerous class certification decisions

from this District, the court in *Schaffer v. Timberland Co*., Civil No. 94-634-JD, 1996 U.S. Dist.

LEXIS 5372, at *16-17 (D.N.H. Mar. 19, 1996) rejected, in a class certification context,[5]

precisely the argument made by the London Group:

> Third, the court rejects the defendants' contention that Kreuser is an atypical plaintiff
> because he engaged in ***"bizarre" trading practices***. According to the defendants,
> Kreuser's strategy as a "day trader" who sought to realize a gain from fractional increases
> in stock price and who acted on subjective impulses, as opposed to a long-term
> investment strategy, "standing alone [is] enough to differentiate him from the typical
> class member." Defendants' Memorandum at 13.

> The fact that a named plaintiff employs an investment strategy different from those of the
> class does not render him atypical because "***it is of no consequence that the putative
> plaintiffs devised different investment strategies as a consequence of their reliance [on
> the market]***." *Tolan v. Computervision Corp*., 696 F. Supp. 771, 780 (D. Mass. 1988);
> see *Kirby*, 116 F.R.D. 303, 308 (D. Mass. 1987) (named plaintiff's "***investment strategy
> is of little importance***" to class certification decision). This is because named plaintiffs
> "need only show that their claims arise from the same course of conduct that gave rise to
> the claims of the absent members." *Priest*, 118 F.R.D. 552, 555 (citing *In re Elscint Ltd.
> Sec. Litig*., No. 85-2622-K, slip op. at 18 (D. Mass. June 22, 1987)).

*Id*. at *16-17 (emphasis added).[6]

Third Millennium's proprietary traders use their education and training in employing

state-of-the-art information systems that enable them to swiftly communicate with the market.

*See* Kazaross Aff. ¶ 4.  Their capabilities include market monitoring and market and technical

---

[5] Class certification opinions are especially persuasive because the adequacy and typicality inquiry is more rigorous
at that stage of the litigation than at the lead plaintiff stage. *See, e.g., Fischler v. Amsouth Bancorporation,* 1997
U.S. Dist. LEXIS 2875, at *7-8 ("A wide-ranging analysis under Rule 23 is not appropriate [at the lead plaintiff
stage of the litigation] and should be left for consideration of a motion for class certification").

[6] *See also Tolan* 696 F. Supp. at 780 (Most investors . . . act under the assumption that [corporate] information is
reflected in the market price of the corporation's stock . . . Thus, the investor who relies on the integrity of a stock's
market price shows the necessary causal connection between the misrepresentation and his injury when false or
incomplete information have colored the market's perception of the corporation's worth."); *In re Sunbeam Sec.
Litig*., No. 98-8258, 2001 U.S. Dist. LEXIS 25703, at *10 (S.D. Fla. July 3, 2001) ("Defendants argue that day
traders, market makers, and short sellers do not rely on the integrity of stock market prices, but rather are motivated
by other trading strategies. ***I find this argument unpersuasive for purposes of fraud on the market analysis***.")
(Emphasis added).

analysis.  *Id.*  Third Millennium's traders constantly follow news and other information concerning the companies in which they invest.  *Id.*  Specifically, through press releases and other public statements issued by such companies, as well as analyst research reports and issuer conference calls, Third Millennium traders are continually reviewing market news and information affecting Third Millenium's investments.  *Id.* Third Millennium traders make investment decisions based on news and other information disseminated to the market.  *Id.* Common sense dictates that professional investors must be aware of market-moving news and developments at least as much as the casual investor.

Third Millennium's proprietary traders engage in transactions based upon the price of a given company's stock or options, its reported financials, the Firm's proprietary methodologies and other publicly available information.  *See* Kazaross Aff. ¶ 7.  In the instant case, Third Millennium's trade decisions were made primarily by one of its proprietary traders relying on the information provided to the market by Biogen and other public sources.  *Id.*  Even if Third Millenium hedged its options positions by making trades in the underlying stock, that strategy does not detract from the fact that it relied on the integrity of the market.  *See Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 412 (D. Minn. 1998) (accepting as Lead Plaintiff a company that is a market maker in options but not stocks.  Even one who buys stocks as a hedge against other investments still "presumably relies on the integrity of the market in selecting that hedge").  Accordingly, Third Millennium has no unique defenses stemming from its trading style, or options trading because it still relied on the same false and misleading statements issued by the defendants during the Class Period -- all of which are presumed to be incorporated into the stock price and any securities that derive their value from the price of the stock, such as options.[7]

---

[7] Despite the London Group's contentions, *MicroStrategy*, 110 F. Supp. 2d at 436 n.11, is distinguishable on this point, because the movant deemed to have engaged in unusual strategies suffered from other deficiencies that would

### 2. Third Millennium Is Not A Market Maker for Biogen Common Stock Nor The Designated Primary Market Maker In Biogen Options

The London Group's argument that Third Millenium is a market maker in Biogen stock or options is factually wrong. According to the National Association of Securities Dealers ("NASD") Manual, a Market Maker on the Nasdaq National Market Exchange (the "NASDAQ") is "a dealer who either regularly publishes bid and ask quotations in an interdealer system or furnishes such quotations on request, and who is 'ready, willing, and able' to trade reasonable quantities of the security in which he is making a market to other dealers at his quoted prices." *See* Kazaross Aff. ¶ 5. A NASDAQ Market Maker is required to apply for registration with the NASD as an official Market Maker in the Nasdaq Market Execution System. *Id*. Registration as a Market Maker is required in order for someone to be a Market Maker. *Id*. The NASDAQ Market Maker position is comparable to a Specialist on the New York Stock Exchange ("NYSE" or "Exchange") who is required to keep records of all purchases and sales initiated on the trading floor of the NYSE for stocks, options, futures and foreign securities in which he is registered. *Id*. NYSE Specialists also ensure that all bids and asks during daily and after-hours trading sessions are timely and accurately reported, that all marketable trades are executed and that order is maintained on the trading floor. *Id*. NYSE Specialists are required to register with the NYSE and gain the Exchange's approval as a particular type of Specialist. *Id*. On the Chicago Board Options Exchange ("CBOE"), the comparable position is the Designated Primary Market Maker

---

have prevented its appointment in any event. That movant, Wolverine Trading, did not provide its transactional information so that the Court could not hold that it had the largest financial interest, which it suspected was not "as large as it averred". *In re MicroStrategy Sec. Litig*., 110 F. Supp. 2d at 436. In addition, the court found that the movant sold all of its shares before any corrective disclosure in the market. *See id*. at n. 23. It was the combination of these factors, none of which apply to the Biogen Institutional Investor Group, that caused the Court to deny Wolverine Trading's motion. In any event, to the extent that trading strategy figured in the *Microstrategy* court's analysis, such holding conflicts with authority from **this District**, other courts within the First Circuit, and the majority rule elsewhere. *See supra* at 7-8, n. 6.

("DPM"), whose responsibilities and obligations are similar to those of NASDAQ Market Makers and NYSE Specialists.  *Id.*

Third Millennium is *not* a Market Maker in Biogen common stock or a DPM in Biogen options.  *See* Kazaross Aff. ¶ 6.  The NASD has not provided Third Millennium with Market Maker privileges, or encumbered Third Millennium with Market Maker responsibilities or obligations.  *Id.*  With regard to Biogen options traded on the CBOE, the DPM (of which there is only one) is Citadel Derivatives Group LLC.  *Id.*  Accordingly, Third Millennium is *not* the DPM of such options.  *Id.*  Third Millennium, like many sophisticated institutional investors, invests in options both on and off the floor of the CBOE for its own account. *Id.* This does not render it a Market Maker or DPM.  *Id.*

While any investor which is able to trade options on the floor of the CBOE can loosely and inaccurately be referred to as a "market maker," the actual market maker on the CBOE is the DPM.  *See* Kazaross Aff. ¶ 7.  With regard to Biogen, Third Millennium was under no obligation to purchase Biogen options, as the DPM would be, in order to maintain orderly trading.  *Id.*  It is that obligation that some courts have held leads to potential unique defenses, *i.e.*, that the market maker is atypical because its purchases do not reflect its reliance on the market because the market maker is simply fulfilling its obligations to ensure a liquid market in a given security.  By contrast, Third Millenium purchased options for ***itself*** based upon its own investment decisions and pricing and other relevant market information.  *Id.*; *see also In Re Sunbeam Sec. Litig.*, No. 98-8258, 2001 U.S. Dist. LEXIS 25703, at *11 (S.D. Fla. July 3, 2001) (accepting a market maker as a Lead Plaintiff because it did not purchase the stock at issue pursuant to its obligations

as a market maker).  Third Millennium's transactions in Biogen stock and options were based on

its reliance on the market for investment reasons only.[8]

In light of the foregoing, Third Millennium is an adequate and typical member of the

Class. Like any typical investor, Third Millenium relied on the market and was injured by

Biogen's false and misleading statements and omissions.  *See Basic Inc.*, 485 U.S. at 245-47

(stating that all investors are injured when false information is released into the public market of

a quoted security:. . . "'it is hard to imagine that there ever is a buyer or seller who does not rely

on market integrity.  Who would knowingly roll the dice in a crooked crap game?'" (citation

omitted)).

### 3.    Third Millennium's "Relationship" With Merrill Lynch Is Not Prejudicial

Despite the London Group's contention, Third Millennium does not have a "proprietary"

relationship with Merrill Lynch which would compel Third Millenium to alter its litigation

position in this case.  See Kazaross Aff. ¶ 9. That Third Millennium currently clears its trades

through Merrill Lynch is not a relationship that threatens to compromise the class. *Id*.  Third

Millennium began clearing through Merrill Lynch as a result of Merrill Lynch's acquisition of

Pax Clearing Corporation, Third Millennium's prior clearing firm, which closed on April 28,

2005.  *Id*.  There are a number of clearing firms which Third Millennium could clear through and

the fact that it currently clears through Merrill Lynch is irrelevant.  *Id.*  Third Millennium intends

---

[8] Furthermore, courts have held that market makers are not inadequate, as a matter of law, to represent the interests of investors.  Rather, the facts and issues in each case must be examined to determine the market maker's typicality. *See McNichols v. Loeb Rhoades & Co.*, 97 F.R.D. 331, 334 (N.D. Ill. 1982); *see also Tice v. NovaStar Fin., Inc.*, Case No. 04-0330-CV-W-ODS, 2004 U.S. Dist. LEXIS 16800, at *24-25 (W.D. Mo. Aug. 23, 2004) (rejecting Market Street Securities, a Market Maker, because court found firm had specific obligations as Market Maker that caused it to enter into stock transactions regardless of issuer's public statement or stock price: "The court emphasizes that it does ***not*** hold that a market maker, as a matter of law and solely by virtue of its role as market maker, can never adequately represent the interests of a class composed of investors."  (emphasis in original) (quoting *McNichols,* 97 F.R.D. at 346)).  Here, the record shows that Third Millennium traders made decisions to invest in Biogen based on news and other information disseminated to the market, just like all other class members. (*see* Kazaross Aff. ¶ 4).  Therefore, it is adequate and typical.

to vigorously prosecute this litigation with the other members of the Biogen Institutional Investor Group and is particularly motivated to do so given the substantial damages it incurred as a result of the defendants' wrongdoing. *Id.*

The London Group's speculation that Merrill Lynch will "undoubtedly like to serve [as an underwriter] in any future Biogen IDEC offerings" (London Group Opposition, at 15) is attenuated at best. Merrill Lynch last underwrote an offering for Biogen in November, 2000, almost five years prior to the operative Class Period. Even if Merrill Lynch did vie to underwrite a future Biogen offering, its acting as a clearing firm for Third Millenium could not conceivably impact Third Millenium's commitment to this case. Any attempts at undue influence by Merrill Lynch would cross ethical walls and violate the law. Finally, the argument ignores the fundamental reality of the relationship, which is that Third Millenium is Merrill Lynch's *client*. Merrill Lynch would not want to exert undue influence (putting aside the illegality of doing so) because the relationship is profitable to it. If it wishes, Third Millenium can simply take its business elsewhere.

### 4.    The Biogen Institutional Investor Group is an Ideal Lead Plaintiff Group

The London Group argues that the Biogen Institutional Investor Group is comprised of seven members which is larger than that endorsed by certain courts and the SEC. This argument fails. First, The London Group reaches the seven member figure by erroneously counting New Jersey Carpenters Pension and Annuity funds as separate, unrelated movants. In fact, New Jersey Carpenters Pension and Annuity Funds are sub-funds of a single pension fund under common administration, the New Jersey Pension Fund, and should not be counted as two separate, unrelated movants. *See* Exhibit B hereto. Moreover, Biogen Institutional Investor Group movants Horatio Capital and Third Millenium are not strangers. They have jointly worked together on

several business projects together and the principals of both firms are close acquaintances. Accordingly, the Biogen Institutional Investor Group is not comprised of seven unrelated movants, but is rather a six member group, certain member of which have preexisting business and personal relationships.

In *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214 (D.D.C. 1999), relied on by The London Group, the court addressed the issue of whether a group comprised of 466 unrelated movants could properly be appointed as lead plaintiff. The court noted that  "[w]hen determining how many plaintiffs is too many, courts thus far have opted for a '***rule of reason***' approach." *Id*. at 217 (emphasis added) (citations omitted). The court held that,"[t]he Lead Plaintiff decision should be made under a ***rule of reason*** but in most cases three should be the initial target, with five or six as the upper limit. "*Id*. at 217 (emphasis added). The court held that the 466 member group before it, and the proposed 20-member steering subgroup, did not fit within the rule of reason because the group's ability to properly direct the litigation would be diluted. Similarly, the *amicus* brief submitted by the SEC in the *Baan* case concluded that, "[c]onstruing the term 'group of persons' in light of the language and purposes of the Act, a court generally should only approve a group that is small enough to be capable of effectively managing the litigation and the lawyers." *Id*. at 224 (the SEC's *amicus* brief is reproduced in the opinion).

The SEC further advised that, typically, a group should be comprised of three to five members, but that other factors should be considered, such as relationship among the members, and did not set an upper limit or bright-line. *See id*. at 224. In addition, the SEC recognized that a primary goal of the PSLRA was to encourage the appointment of ***institutional investors*** as lead plaintiffs. *See id*. at 223. The SEC was concerned that the appointment of large groups comprised of unrelated investors "each of whom have suffered ***modest losses***," would not benefit the class

because no group member would be sufficiently motivated to devote time and resources to the case. *Id*. at 224 (emphasis added).

The facts before this Court are not analogous to those present in the *Baan* case. The Biogen Institutional Investor Group is comprised of six institutional movants each of which has a substantial interest in this matter and some of which have preexisting business and personal relationships. The Biogen Institutional Investor Group is comprised of the type of investors that countless courts, and the SEC, have held to be favored lead plaintiffs. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001) ("Both the Conference Committee Report and the Senate Report state that the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff.").[9] The Biogen Institutional Group not only is a proper group pursuant to the "rule of reason" it is an ideal lead plaintiff whose appointment will fulfill both the letter and spirit of the PSLRA.[10]

### 5.    Discovery Against Biogen Institutional Investor Group Is Unnecessary and Inappropriate

The London Group's last-gasp request for discovery to determine the Biogen Institutional Investor Group's adequacy must be denied.  Pursuant to the PSLRA, discovery from lead plaintiff movants is available under the following circumstances:

Discovery.  For purposes of this subparagraph, discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff may be conducted

---

[9] The London Group also argues that the members of the Biogen Institutional Investor Group are dispersed geographically, which will complicate coordination efforts. This is a strange argument to be raised by a London pension fund seeking Lead Plaintiff appointment with a U.S. fund in a U.S.  federal court. The argument lacks merit because effective coordination is, nowadays, not dependent on face-to-face communications. The business world is held together by the Internet and conference calls, and these are effective and efficient methods for the members of the Biogen Institutional Investor Group to coordinate their litigation efforts when they are not face-to-face.

[10] The London Pensions Fund/National Elevator claims that more information is needed to determine if Folksam Asset Management purchased securities for its own account or for its clients. Folksam purchased the Biogen stock at issue for its own account. This is obvious from Folksam's sworn certification, submitted with the original motion, which identifies the *Folksam* accounts where the relevant transactions occurred. No further evidence on this point is needed.

by a plaintiff *only if* the plaintiff first demonstrates a ***reasonable basis*** for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.

15 U.S.C. § 78u-4(a)(3)(B)(iv) (emphasis added).  As is evidenced by the fact that the London Group does not cite any cases allowing discovery against lead plaintiff movants, such requests are rarely granted.  The request should not be granted here because the London Group's attacks against the Biogen Institutional Investor Group's adequacy, as discussed above, are factually incorrect, speculative and/or irrelevant, none of which can form the "reasonable basis" required by the statute.  *See In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998) ("speculative and hypothetical" attacks are insufficient to rebut the presumption); *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 547 (N.D. Tex. 1997) ("speculative assertions are insufficient" to demonstrate a movant's inadequacy). In addition, the PSLRA's strict timetable cautions against allowing discovery except under exceptional circumstances.  *See Borenstein v. Finova Group*, No. CIV 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732, at *24-25 (D. Ariz. Aug. 28, 2000) ("The statute provides an accelerated timeline for resolving Lead Plaintiff issues in order to facilitate the efficient resolution of securities class actions.  Permitting limited discovery now would only further delay the meaningful start of this lawsuit").  In any event, the Biogen Institutional Investor Group's initial submission and Mr. Kazaross's affidavit, submitted herewith, provide a full description of the Biogen Institutional Investor Group's business and financial interest in this case.  The record contains all the facts the Court needs to identify the movant with the largest financial interest that otherwise meets the relevant Rule 23 requirements, or that might be otherwise adduced through any discovery.  The record compels the conclusion that the Biogen Institutional Investor Group readily meets those requirements.  On the record before the Court, appointing as Lead Plaintiff anyone other than the Biogen Institutional Investor

Group would run counter to the PSLRA. Certainly, there is no "proof" to the contrary. 15 U.S.C.

§ 78-(a)(3)(B)(iii)(II).

### 6.     The Class Will Benefit If Third Millenium And Horatio Capital Are Appointed As Lead Plaintiff In This Matter and in the Class Actions Pending Against Elan

In a footnote, The London Group argues that Third Millenium and Horatio Capital have

moved for appointment as lead plaintiff in the Elan Securities Litigation which presents a

conflict to their appointment in this matter. The nature of the conflict is not articulated and no

authority is provided for this argument. Indeed, there can be no conflict in a single class member

acting as lead plaintiff in securities actions against different defendants, even if the wrongs may

involve the same or similar underlying facts, because the lead plaintiff would be motivated to

extract the maximum recovery from all defendants. There may be a conflict preventing a single

firm from *defending* both Biogen and Elan because each company may point a finger at the

other, but nothing prevents a particular investor who incurred a loss on two stocks from

representing absent class members in each case against different defendants.[11] There is no

conflict because the plaintiffs in the *Biogen* and *Elan* cases seek recovery against different sets of

defendants, for their respective wrongful acts, on behalf of different classes, from different

sources of recovery or insurance. There is no limited fund against which claims are being

asserted.

Indeed, the class could even benefit from an overlap in the Lead Plaintiff and Lead

Counsel structures in the Biogen and Elan actions.. The connection between the two sets of cases

is that both involve similar representations made by Biogen and Elan (and their respective

---

[11] The only proposition that can theoretically support the conflict argument raised by The London Group is that a separate lead plaintiff is needed for each defendant, regardless of how many issuers are involved. Thus, if The London Group was right, a separate lead plaintiff would be needed for the issuer defendant (Biogen), each individual defendant (each of Biogen's officer/director defendants) and, if there were any, each auditor defendant, each underwriter defendant and so on. There is plainly no such rule.

officers and directors) concerning the safety of the same drug, Tysabri, which was primarily developed by Elan and marketed jointly with Biogen. Thus, a central issue in the cases -- whether Tysabri was as safe as defendants represented -- will be similar. Substantial efficiencies and synergies could be realized from plaintiffs' counsel's concerted efforts in the separate actions. [12]

## **CONCLUSION**

For the reasons detailed herein and in their prior submission, the Biogen Institutional Investor Group respectfully request that this Court: (1) consolidate the actions presently pending in the District of Massachusetts; (2) appoint them as Lead Plaintiff pursuant to § 21D(a)(3)(B); (3) approve its selection of Milberg Weiss and Entwistle & Cappucci as Co-Lead Counsel, and Moulton & Gans as Liaison Counsel; and (4) deny all competing motions.

DATED:  June 1, 2005                    Respectfully submitted,


                                        **MOULTON & GANS, P.C.**


                                        By:  /s/ Nancy Freeman Gans
                                        Nancy Freeman Gans, BBO #184540
                                        33 Broad Street, Suite 1100
                                        Boston, MA  02109
                                        Telephone:  (617) 369-7979

                                        *Proposed Liaison Counsel*

---

[12] Elan Institutional Investor Group seeks appointment of Milberg Weiss and Entwistle & Cappucci as Lead Counsel. The purported conflict argument is premature because there has been no ruling on the Lead Plaintiff/Lead Counsel issue in the *Elan* matter. However, the motion of the Elan Institutional Investor Group is presently unopposed, even though several additional class members initially filed competing motions and the time for the filing of oppositions has passed. That no other movant has attacked Third Millenium or Horatio's application in the *Elan* case is telling and evidences their suitability to act as Lead Plaintiffs in this matter. We note that unlike the *Biogen* cases, actions against Elan, and lead plaintiff motions filed in the *Elan* Actions, are pending not only in this District but also in the Southern District of New York and the Northern District of Illinois, Eastern Division. The motion of the Elan Institutional Investor Group is unopposed in any jurisdiction.

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci
Stephen D. Oestreich
Robert N. Cappucci
299 Park Avenue
New York, NY  10171
(212) 894-7200

**MILBERG WEISS BERSHAD**
    **& SCHULMAN LLP**
Steven G. Schulman
Anita B. Kartalopoulos
Peter E. Seidman
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300

*Proposed Co-Lead Counsel*


## CERTIFICATE OF SERVICE

I, Andrei Rado, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Andrei Rado
Andrei Rado

# Exhibit A

1

THE HONORABLE RICARDO S. MARTINEZ

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

WESTERN DISTRICT OF WASHINGTON

10

| | |
|---|---|
| 11 | F. L. HEYWOOD, Individually and On Behalf of All Others Similarly Situated,   )<br>  )<br>Plaintiff,   )<br>  )<br>vs.   )<br>  )<br>CELL THERAPEUTICS, INC., et al.   )<br>  )<br>Defendants.   )<br>————————————————————— ) | No. 2:05-cv-00396-RSM<br><br>CLASS ACTION<br><br>THE FAN GROUP'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR APPOINTMENT AS LEAD PLAINTIFF PURSUANT TO §21D(A)(3)(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND IN OPPOSITION TO ALL COMPETING MOTIONS |

11

F. L. HEYWOOD, Individually and On Behalf )
of All Others Similarly Situated,                              )
                                                                                )
12                                           Plaintiff,              )
                                                                                )
13                         vs.                                            )
                                                                                )
14   CELL THERAPEUTICS, INC., et al.                    )
                                                                                )
15                                          Defendants.            )
   ————————————————————— )
16   MELANY SHTIVELMAN, On Behalf of              )
17   Herself and All Others Similarly Situated,        )
                                                                                )
18                                          Plaintiff,               )
                                                                                )
19                          vs.                                           )
                                                                                )
20   CELL THERAPEUTICS, INC., et al.                    )
                                                                                )
21                                         Defendants.             )
   ————————————————————— )

No. 2:05-cv-00396-RSM

CLASS ACTION

THE FAN GROUP'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR APPOINTMENT AS LEAD PLAINTIFF PURSUANT TO §21D(A)(3)(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND IN OPPOSITION TO ALL COMPETING MOTIONS

NOTE ON MOTION CALENDAR: Friday, May 27, 2005

No. 2:05-cv-00415-RSM

CLASS ACTION

22

23   [Caption continued on following page.]

24

25

26

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1

2   DEAN M. DENUCCIO, Individually and On        )    No. 2:05-cv-00452-RSM
    Behalf of All Others Similarly Situated,      )
3                                                 )    CLASS ACTION
                         Plaintiff,               )
4                                                 )
                                                  )
5        vs.                                      )
                                                  )
6   CELL THERAPEUTICS, INC., et al.               )
                                                  )
                         Defendants.              )
7                                                 )
    YONGFENG XI, Individually and On Behalf       )    No. 2:05-cv-00457-RSM
8   of All Others Similarly Situated,             )
                                                  )    CLASS ACTION
9                        Plaintiff,               )
                                                  )
10       vs.                                      )
                                                  )
11  CELL THERAPEUTICS, INC., et al.               )
                                                  )
12                       Defendants.              )
                                                  )
13  TOM SUNDAY, On Behalf of Himself and All)     No. 2:05-cv-00639-RSM
    Others Similarly Situated,                    )
14                                                )    CLASS ACTION
                         Plaintiff,               )
15                                                )
                                                  )
16       vs.                                      )
                                                  )
17  CELL THERAPEUTICS, INC., et al.               )
                                                  )
                         Defendants.              )
18                                                )

19  [Caption continued on following page.]

20

21

22

23

24

25

26

| | |
|---|---|
| 1 | |
| 2 | MOUSSA YEROUSHALMI, Individually and )    No. 2:05-cv-00649-RSM |
| 3 | On Behalf of All Others Similarly Situated, ) <br> )    <u>CLASS ACTION</u> |

MOUSSA YEROUSHALMI, Individually and
On Behalf of All Others Similarly Situated,   )
                                              )   No. 2:05-cv-00649-RSM
                         Plaintiff,           )
                                              )   CLASS ACTION
        vs.                                   )
                                              )
CELL THERAPEUTICS, INC., et al.               )
                                              )
                         Defendants.          )
                                              )
LUCENTI ANTONIO, On Behalf of Himself         )   No. 2:05-cv-00657-RSM
All Others Similarly Situated,                )
                                              )   CLASS ACTION
                         Plaintiff,           )
                                              )
        vs.                                   )
                                              )
CELL THERAPEUTICS, INC., et al.               )
                                              )
                         Defendants.          )
                                              )
RICHARD FUCHS, Individually and On            )   No. 2:05-cv-00739-RSM
Behalf of All Others Similarly Situated,      )
                                              )   CLASS ACTION
                         Plaintiff,           )
                                              )
        vs.                                   )
                                              )
CELL THERAPEUTICS, INC., et al.               )
                                              )
                         Defendants.          )
                                              )

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   ARGUMENT.........................................................................................3

   A.   The Fan Group Is Presumptively the Most Adequate Plaintiff to Serve as
        Lead Plaintiff ...............................................................................3

   B.   ABC Arbitrage Cannot Be Appointed as Lead Plaintiff.........................5

        1.   ABC Arbitrage Has Submitted a Defective Certification............................5

        2.   ABC Arbitrage Is *Admittedly* an Atypical Investor and Is Incapable
             of Representing the Class.............................................................7

        3.   The Appointment of ABC Arbitrage Will Likely Subject the Class
             to Unique Jurisdictional Attacks...................................................9

        4.   ABC Arbitrage Resides Too Far Away to Be an Effective Lead
             Plaintiff .................................................................................10

   C.   The Rothamel Group Cannot Be Appointed as Lead Plaintiff..............................11

   D.   The Remaining Movants Cannot Be Appointed as Lead Plaintiff .........................12

III.  CONCLUSION.....................................................................................12

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)                          - i -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA  98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1

## TABLE OF AUTHORITIES

2
**Page**

3 **CASES**

4  Basic Inc. v. Levinson,
       485 U.S. 224 (1988)..................................................................................................7
5
   Bersch v. Drexel Firestone, Inc.,
6      519 F.2d 974 (2d Cir. 1975)......................................................................................5

7  Chill v. Green Tree Fin. Corp.,
       181 F.R.D. 398 (D. Minn. 1998).............................................................................6, 7
8
   Dura Pharms., Inc. v. Broudo,
9      ___ U.S. ___, 125 S. Ct. 1627 (2005)......................................................................2, 9

10 Greebel v. FTP Software,
       939 F. Supp. 57 (D. Mass. 1996) ........................................................................2, 6, 7
11
   Hanlon v. Chrysler Corp.,
12     150 F.3d 1011 (9th Cir. 1998) ...................................................................................3

13 In re AM Int'l, Inc. Sec. Litig.,
       108 F.R.D. 190 (S.D.N.Y. 1985) ...............................................................................8
14
   In re Baan Co. Sec. Litig.,
15     186 F.R.D. 214 (D.D.C. 1999)................................................................................4, 5

16 In re Bank One S'holders Class Actions,
       96 F. Supp. 2d 780 (N.D. Ill. 2000) ...........................................................................7
17
   In re Cable & Wireless, PLC, Sec. Litig.,
18     217 F.R.D. 372 (E.D. Va. 2003)........................................................................2, 5, 10

19 In re Cavanaugh,
       306 F.3d 726 (9th Cir. 2002) ...................................................................................12
20
   In re Cendant Corp. Litig.,
21     264 F.3d 201 (3d Cir. 2001)......................................................................................3

22 In re Conseco, Inc. Sec. Litig.,
       120 F. Supp. 2d 729 (S.D. Ind. 2000)..........................................................................2
23
   In re Critical Path, Inc.,
24     156 F. Supp. 2d 1102 (N.D. Cal. 2001) ..................................................................9, 11

25 In re MicroStrategy Inc. Sec. Litig.,
       110 F. Supp. 2d 427 (E.D. Va. 2000) ................................................................. passim
26

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)                - ii -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA  98101
Telephone: 206/749-5544 • Fax: 206/749-9978

**Page**

*In re Network Assocs. Sec. Litig.,*
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ............................................................................11

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
    219 F.R.D. 343 (D. Md. 2003)...............................................................................2, 3, 5, 10

*In re Safeguard Scientifics,*
    216 F.R.D. 577 (E.D. Pa. 2003) ...........................................................................................9

*In re Terayon Communications Sys. Sec. Litig.,*
    No. C 00-01976 MHP, 2004 U.S. Dist. LEXIS 3131
    (N.D. Cal. Feb. 23, 2004)...........................................................................................5, 6, 7, 9

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,*
    209 F.R.D. 353 (S.D.N.Y. 2002) .......................................................................................11

*SEC v. Berger,*
    322 F.3d 187 (2d Cir. 2003)..................................................................................................5

*Switzenbaum v. Orbital Sci. Corp.,*
    187 F.R.D. 246 (E.D. Va. 1999) ...........................................................................................5

*Weisz v. Calpine Corp.,*
    No. C 02-1200 SBA, Order at 12 (N.D. Cal. Aug. 19, 2002).............................................9

*Weltz v. Lee,*
    199 F.R.D. 129 (S.D.N.Y. 2001) .........................................................................................4

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4 ......................................................................................................................... *passim*

Federal Rules of Civil Procedure
    Rule 23 ........................................................................................................................ *passim*

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)                - iii -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA  98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1    Proposed lead plaintiffs Adrian Fan, Xinting Fu and Paul Guez, individually and on behalf of

2   Commerce Investment Group LLC and Integrated Apparel LLC (the "Fan Group") and class

3   member Lucenti Antonio submit this memorandum in further support of the Fan Group's motion to

4   be appointed as lead plaintiff pursuant to §21D(a)(3)(B) of the Securities Exchange Act of 1934

5   ("Exchange Act") and in opposition to the motions filed by other Cell Therapeutics, Inc. ("Cell

6   Therapeutics" or the "Company") investors seeking to be appointed as lead plaintiff in this action.

7   **I.    INTRODUCTION**

8    Presently pending before the Court are ten motions for appointment as lead plaintiff and lead

9   counsel in connection with this securities fraud class action against Cell Therapeutics. All movants

10   agree that the Private Securities Litigation Reform Act of 1995 ("PSLRA") directs the Court to

11   appoint as lead plaintiff the movant "that the court determines to be most capable of adequately

12   representing the interests of [the] class members" in this litigation. 15 U.S.C. §78u-4(a)(3)(B)(i).

13   Nor is there any dispute that the PSLRA provides that:

14       [T]he court shall adopt a presumption that the most adequate plaintiff . . . is the
         person or **group of persons** that –
15

16           (aa)    has either filed the complaint or made a motion in response to a notice
         . . . ;

17           (bb)    in the determination of the court, has the largest financial interest in
         the relief sought by the class; **and**
18

19           (cc)    otherwise satisfies the requirements of Rule 23 of the Federal Rules of
         Civil Procedure.

20   15 U.S.C. §78u-4(a)(3)(B)(iii)(I).[1]  While the lead plaintiff must satisfy each of these requirements,

21   "it is clear that the second factor must be considered only with respect to the universe of class

22   members who otherwise satisfy the first and third factors." *In re MicroStrategy Inc. Sec. Litig.*, 110

23   F. Supp. 2d 427, 433 n.11 (E.D. Va. 2000).

24

25   _____

26   [1]    Emphasis is added and internal citations and footnotes are omitted here and throughout,
     unless otherwise indicated.

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)          - 1 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1    While ABC Arbitrage claims a facially larger loss, it cannot be appointed lead plaintiff for

2  three reasons. *See In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 377 (E.D. Va. 2003)

3  ("[A] movant's financial interest is just a beginning point, and courts acknowledge that they must

4  also consider the movant's ability and willingness to adequately represent the class."); *see also In re*

5  *Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343, 350 (D. Md. 2003) (reasoning that the lead

6  plaintiff determination must be made based on more than just claimed financial interest).  ***First,***

7  ABC Arbitrage is not the most adequate plaintiff because it has submitted a defective certification

8  that fails to comport with a basic requirement of the PSLRA – namely, that the certification ***shall***

9  "set[] forth ***all of the transactions of the plaintiff*** in the security that is the subject of the complaint

10  during the Class Period."   15 U.S.C. §78u-4(a)(2)(A)(iv).   Here, ABC Arbitrage – in clear

11  contravention of the PSLRA's certification requirement – has failed (intentionally or because it is

12  unable or unwilling to pay sufficient attention to this case) to disclose all of its transactions in Cell

13  Therapeutics during the Class Period. *See Greebel v. FTP Software*, 939 F. Supp. 57, 62, 64 (D.

14  Mass. 1996) (holding that a movant that fails to meet the PSLRA's certification requirement may not

15  be appointed lead plaintiff). ***Second,*** ABC Arbitrage relies on atypical trading strategies to make a

16  profit on securities transactions, no matter the integrity of the market or the underlying fundamentals

17  of a security. *See* Declaration of Tamara J. Driscoll in Support of the Fan Group's Memorandum of

18  Law in Further Support of Its Motion for Appointment as Lead Plaintiff Pursuant to §21D(A)(3)(B)

19  of the Securities Exchange Act of 1934 and in Opposition to All Competing Motions ("Driscoll Opp.

20  Decl."), Exs. A-C.  Thus, because ABC Arbitrage admittedly does not rely on the integrity of the

21  market, it is an atypical investor and is incapable of leading this litigation. *See Dura Pharms., Inc. v.*

22  *Broudo*, ___ U.S. ___, 125 S. Ct. 1627, 1633 (2005). *See also In re Conseco, Inc. Sec. Litig.*, 120 F.

23  Supp. 2d 729, 733 (S.D. Ind. 2000) (refusing to appoint movant because, among other reasons, "its

24  arbitrage trading strategy rendered the fund inadequate"). ***Third,*** ABC Arbitrage – a French

25  arbitrage firm – is subject to unique defenses relating to subject matter jurisdiction which will

26  undoubtedly be exploited by the capable and experienced counsel representing the defendants in this

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)
                                                    - 2 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1   action. *See, e.g., Royal Ahold*, 219 F.R.D. at 352 (holding that "foreign purchasers face serious

2   jurisdictional obstacles to having their claims heard in U.S. courts"). Because ABC Arbitrage does

3   not meet the requirements of Rule 23 and is subject to unique defenses, it cannot be considered for

4   appointment as lead plaintiff. *MicroStrategy*, 110 F. Supp. 2d at 433.

5        With its typical trading pattern and substantial Class Period losses, the Fan Group and its

6   chosen counsel are uniquely qualified to represent plaintiffs in this litigation and respectfully move

7   this Court to appoint them as lead plaintiff and to approve of their choice of lead counsel.

8   **II.    ARGUMENT**

9        **A.    The Fan Group Is Presumptively the Most Adequate Plaintiff to Serve
    as Lead Plaintiff**

10

11        Pursuant to the PSLRA, the Fan Group is the presumptive "most adequate plaintiff" and

12   should be appointed lead plaintiff in this case because it has the largest financial interest of all

13   movants that both satisfy the requirements of Rule 23 and are not subject to any unique defenses.

14   *See* 15 U.S.C. §78u-4(a)(3)(B); *Royal Ahold*, 219 F.R.D. at 348.

15        During the Class Period the Fan Group suffered losses of approximately $1.1 million based

16   on its purchase of Cell Therapeutics shares at a cost of over $2.2 million. *See* Declaration of

17   Tamara J. Driscoll in Support of Motion to Consolidate Related Actions, Appoint the Fan Group as

18   Lead Plaintiff and for Approval of Its Selection of Lead Counsel ("Driscoll Decl."), Exs. B, C.

19   Additionally, the Fan Group's claims are typical of the claims of the class because its claims arise

20   from the same course of events and are based on the same legal theories as the claims of all other

21   investors in Cell Therapeutics securities. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 264-65 (3d

22   Cir. 2001); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

23        The Fan Group is also an adequate representative as each member has signed a valid

24   certification which satisfies the requirements of the PSLRA demonstrating their willingness to

25   assume the responsibilities of lead plaintiff. In protecting its own interests in this litigation, the Fan

26   Group will also be protecting the interests of the class because those interests are clearly aligned and

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)                    - 3 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1  there are no antagonistic interests between the class and the Fan Group. Further, the Fan Group has

2  retained counsel experienced in securities litigation and well-suited to prosecute this action on behalf

3  of the class. *See* Driscoll Decl., Exs. D, E.

4       Additionally, the Fan Group is a small group of investors and constitutes an appropriate lead

5  plaintiff under the provisions of the PSLRA. The plain language of the PSLRA requires courts to

6  adopt a presumption "that the most adequate plaintiff in any private action arising under [the

7  Exchange Act] is the person *or group of persons*" with the largest financial interest and who also

8  satisfies Rule 23's requirements. 15 U.S.C. §78u-4(a)(3)(B)(iii)(I). *See also* 15 U.S.C. §78u-

9  4(a)(3)(B)(i) (directing courts to appoint the "*member or members* of the purported plaintiff class"

10  most capable of representing the class).

11      The Securities and Exchange Commission ("SEC"), the agency charged with interpreting and

12  enforcing the federal securities laws, has clarified the meaning of "group" for purposes of the

13  PSLRA's lead plaintiff provisions, concluding that the presumption of most adequate plaintiff

14  applies to "'a group that is small enough to be capable of effectively managing the litigation and the

15  lawyers. The [SEC] believes that ordinarily this should be no more than *three to five persons*, a

16  number that will facilitate joint decision[-]making and also help to assure that each group member

17  has a sufficiently large stake in the litigation.'" *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 216-17

18  (D.D.C. 1999) (quoting memorandum submitted by the SEC); *see also Weltz v. Lee*, 199 F.R.D. 129

19  (S.D.N.Y. 2001) (listing cases). Each member of the Fan Group suffered a significant loss in

20  connection with their transactions in Cell Therapeutics securities, and thus, in accordance with the

21  SEC's wishes, has a "sufficiently large stake in the litigation." *Baan*, 186 F.R.D. at 217.

22  Consequently, the Fan Group is an appropriate group and is the most adequate plaintiff to serve as

23  lead plaintiff in this case.

24      Unlike ABC Arbitrage, which fails to meet the requirements of Rule 23, is burdened with

25  potentially crippling unique defenses, and therefore is not entitled to the "most adequate plaintiff"

26  presumption, the Fan Group provides no issues for defendants to exploit to the detriment of the class.

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)            - 4 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA  98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1    *See In re Terayon Communications Sys. Sec. Litig.*, No. C 00-01976 MHP, 2004 U.S. Dist. LEXIS

2    3131, at \*23-\*25 (N.D. Cal. Feb. 23, 2004); *Baan*, 103 F. Supp. 2d at 11; *Bersch v. Drexel*

3    *Firestone, Inc.*, 519 F.2d 974, 988-89 (2d Cir. 1975); *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir.

4    2003). The Fan Group has the largest financial interest in the litigation of all movants who also

5    otherwise satisfy the typicality and adequacy requirements of Rule 23. 15 U.S.C. §78u-

6    4(a)(3)(B)(iii)(I). Accordingly, the Fan Group should be appointed lead plaintiff.

7       **B.    ABC Arbitrage Cannot Be Appointed as Lead Plaintiff**

8       The PSLRA requires that the class member appointed to lead this litigation possess ***both*** the

9    largest financial interest ***and*** satisfy the requirements of Rule 23. *See* 15 U.S.C. §78u-

10    4(a)(3)(B)(iii)(I). "Even if a candidate has the largest financial interest in a case, it is not the

11    presumptive Lead Plaintiff unless it 'otherwise satisfies the requirements of Rule 23.'" *Switzenbaum*

12    *v. Orbital Scis. Corp.*, 187 F.R.D. 246, 250 (E.D. Va. 1999). *See Cable & Wireless*, 217 F.R.D. at

13    377 ("[A] movant's financial interest is just a beginning point, and courts acknowledge that they

14    must also consider the movant's ability and willingness to adequately represent the class."); *Royal*

15    *Ahold*, 219 F.R.D. at 350. Indeed, "it is clear that [a movant's financial interest] must be considered

16    ***only*** with respect to the universe of class members who otherwise satisfy the [other requirements of

17    the PSLRA]." *MicroStrategy*, 110 F. Supp. 2d at 433 n.11. While ABC Arbitrage claims the largest

18    financial interest, it cannot be considered for appointment as lead plaintiff as it has submitted a

19    defective certification, fails to satisfy the requirements of Rule 23 and is subject to unique defenses.

20       **1.    ABC Arbitrage Has Submitted a Defective Certification**

21       The PSLRA requires each lead plaintiff applicant to provide a sworn certification setting

22    forth ***all of its transactions*** during the Class Period:

23         Each plaintiff seeking to serve as a representative party on behalf of a class shall
         provide a sworn certification, which shall be personally signed by such plaintiff and

24         filed with the complaint, that –

25                     \*    \*    \*

26

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)    - 5 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1
2

> (iv)    *sets forth all of the transactions of the plaintiff* in the security that is the subject of the complaint during the class period specified in the complaint

3   15 U.S.C. §78u-4(a)(2)(A). This provision is neither a mere formality nor is it permissive. The lead

4   plaintiff certification is one of the PSLRA's *fundamental requirements and must be met. See Chill*

5   *v. Green Tree Fin. Corp.*, 181 F.R.D. at 409-10 (D. Minn. 1998); *Greebel*, 939 F. Supp. at 61. Any

6   party not meeting these requirements *may not serve as lead plaintiff. Chill*, 181 F.R.D. 398.

7           Rather than setting forth "all of its transactions" as required by the PSLRA, ABC Arbitrage

8   or its counsel *has artfully crafted a certification which states that it has listed only "transactions in*

9   *the common stock of Cell Therapeutics, Inc." See* Declaration of Arthur Stock in Support of

10  Motion of ABC Arbitrage for Consolidation of Related Cases, for Appointment of Plaintiff as Lead

11  Plaintiff, and for Appointment of Berger & Montague, P.C. as Lead Counsel, Ex. A. Thus, while it

12  appears that ABC Arbitrage claims that it has incurred losses of over $1.7 million, it has failed to

13  provide the Court with the requisite information needed to make a proper determination of financial

14  interest based on the movants' transparent trading information. ABC Arbitrage must disclose *all of*

15  *its Cell Therapeutics transactions, including its atypical transactions involving put and call*

16  *options or other derivative instruments* related to Cell Therapeutics and the profits derived

17  therefrom as required by the PSLRA. *See* 15 U.S.C. §78u-4(a)(2)(A)(iv). *See also Terayon*, 2004

18  U.S. Dist. LEXIS 3131, at *12 (finding movant's certification defective because it failed to list

19  movant's "put" transactions).

20          The importance with which this Court must place on scrutinizing ABC Arbitrage, especially

21  in light of its potentially debilitating unique defenses, cannot be overstated. On the current record,

22  significant unresolved questions remain, including: (1) What other trading activity did ABC

23  Arbitrage engage in using other financial instruments relative to Cell Therapeutics? and (2) Has

24  ABC Arbitrage profited as a result of its other transactions in Cell Therapeutics securities? With

25  such a cloud of uncertainty hanging over ABC Arbitrage and the class, ABC Arbitrage certainly

26  cannot be appointed lead plaintiff.

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)                    - 6 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1    Because ABC Arbitrage has submitted a facially defective certification in support of its

2   motion for appointment as lead plaintiff, ABC Arbitrage's application for appointment as lead

3   plaintiff should be denied. *See Terayon*, 2004 U.S. Dist. LEXIS 3131, at *12; *Chill*, 181 F.R.D. at

4   409-10; *Greebel*, 939 F. Supp. at 61.

5                    **2.      ABC Arbitrage Is *Admittedly* an Atypical Investor and Is**
                              **Incapable of Representing the Class**

6

7          ABC Arbitrage *is not an investor in any true sense of the word* – but rather, is an arbitrageur

8   which does not satisfy the adequacy and typicality requirements of Rule 23. *See* 15 U.S.C. §78u-

9   4(a)(3)(B)(iii)(I); *see also In re Bank One S'holders Class Actions*, 96 F. Supp. 2d 780, 784 (N.D.

10  Ill. 2000); *MicroStrategy*, 110 F. Supp. 2d at 436-37. Unlike typical class members, ABC Arbitrage

11  engages in "arbitrage strategies which exploit opportunities that are *independent of directional risk*

12  *or event risk*. The opportunities exploited are perfectly hedged and subject to a strict convergence

13  protocol within a defined timeframe. *The only risks involved are specific to ABC arbitrage,*

14  *hedging error, calculation error, conterparty risk*." See Driscoll Opp. Decl., Ex. A.

15         The United States Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 245-47 (1988),

16  held that it was reasonable to accept a rebuttable presumption in cases brought under the federal

17  securities laws that "[a]n investor who buys or sells stock at the price set by the market *does so in*

18  *reliance on the integrity of that price*. Because most publicly available information is reflected in

19  market price, an investor's reliance on any public material misrepresentations, therefore, may be

20  presumed for purposes of a Rule 10b-5 action" *Id.* at 247. However, the Court noted that the

21
    presumption of reliance could be rebutted by defendants by demonstrating that the plaintiffs did not

22
23  "rely[] on the integrity of the market." *Id.* at 249.

24         "[A] proposed class representative who *clearly did not* rely upon either the allegedly

25  misleading financials *or on the integrity of market price* or information is subject to unique

26  defenses, and therefore *may not* represent the class." *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190,

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)                    - 7 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1    195 (S.D.N.Y. 1985). Here, defendants will no doubt attempt to rebut the presumption of reliance

2    with respect to ABC Arbitrage's trades in Cell Therapeutics because ABC Arbitrage *does not* rely

3    upon the integrity of the market when trading in the securities markets. To the contrary, ABC

4    Arbitrage *admits* that its trading strategies rely upon the *inefficiencies* in the market.

5         Information printed from ABC Arbitrage's own website at www.abc-arbitrage.com

6    demonstrates that ABC unquestionably does not rely upon the integrity of the market in trading in

7    securities. ABC Arbitrage describes the definition of its business as "tak[ing] advantage of financial

8    market inefficiencies." *See* Driscoll Opp. Decl., Ex. B. In addition, it notes:

9

10        Derived from quantitative management, *arbitrage enables investor [sic] to make a*
          *profit from a difference in value between two comparable assets or markets.* For
11        example, a same asset [sic] is bought and sold at the same time on two different
          markets, a derivative instrument and its underlying asset, two different maturity dates
12        of the same derivative instrument.

13                          *        *        *

14        Arbitrage can be defined as a series of transactions carried out in financial markets *to*
          *profit from an unjustified price difference* between financial instruments. The
15        group terms price differences as "unjustified" only if they can be objectively
          calculated using a mathematical or statistical process. This means that the outcome
16        is identical irrespective of the timeframe or the trader who performed the calculation.

17        *ABC arbitrage applies a rigorous definition of arbitrage* and *only undertakes*
          *transactions whose convergence process is defined by a specific set of rules. These*
18        *transactions are performed to produce results that are independent from stock*
          *market*, exchange rate and interest rate *fluctuations*.
19
                          *        *        *
20
          *Unlike speculators who bet on which way the market is likely to go and react to all*
21        *kinds of rumours, arbitrageurs adopt a rational approach, based on tried and*
          *tested methods*.
22

23    *Id.*

24         Clearly, it is not a mere question that may arise regarding ABC Arbitrage's ability to claim

25    the fraud-on-the-market presumption of reliance, but ABC Arbitrage's business policies and

26    definition have *erased any doubt* that *it does not rely upon the integrity of the market*. Private

      securities fraud actions are meant to protect investors against those economic losses caused by

1  misrepresentation and/or omissions. *Dura Pharms.*, 125 S. Ct. at 1633. Here, ABC Arbitrage

2  admittedly does not rely on any misrepresentations and will not be able to prove reliance.

3  Consequently, ABC Arbitrage is subject to unique defenses that render it incapable of adequately

4  representing the class. It would be a poor choice to appoint a class representative that did not rely on

5  the market price and any misrepresentations or omissions made concerning Cell Therapeutics. *See*

6  *Terayon*, 2004 U.S. Dist. LEXIS 3131, at *21-*22; *In re Critical Path, Inc.*, 156 F. Supp. 2d 1102,

7  1110 (N.D. Cal. 2001). *See also Weisz v. Calpine Corp.*, No. C 02-1200 SBA, Order at 12 (N.D.

8  Cal. Aug. 19, 2002) (Driscoll Opp. Decl., Ex. D); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb) (noting that

9  a movant cannot be appointed as lead plaintiff where the plaintiff "is subject to unique defenses that

10  render such plaintiff incapable of adequately representing the class").

11         As such, ABC Arbitrage fails to satisfy Rule 23 and is subject to unique defenses, as

12  defendants will no doubt argue that ABC Arbitrage's investment strategy is not the approach of the

13  typical investor members of the class who purchased Cell Therapeutics securities in reliance on

14  publicly-available information. Because these atypical arbitrage investment strategies clearly have

15  nothing to do with defendants' fraudulent public statements and/or omissions, ABC Arbitrage cannot

16  be appointed in this case. *See, e.g., In re Safeguard Scientifics*, 216 F.R.D. 577, 582-83 (E.D. Pa.

17  2003). As the court explained in *MicroStrategy*:

18         [E]ven assuming Wolverine Trading's evidence of loss was sufficient, its application
           did not satisfy the statutory requirements of typicality and adequacy . . . . Evidence
19         presented ... confirmed that Wolverine Trading was an atypical investor that engages
           in transactions far beyond the scope of what a typical investor contemplates . . . .
20         Accordingly, Wolverine Trading may [be] *subject to unique defenses based on its
           method of doing business*. For these reasons, Wolverine Trading [is] not an adequate
21         class representative.

22  110 F. Supp. 2d at 436-37.

23              **3.    The Appointment of ABC Arbitrage Will Likely Subject the
                        Class to Unique Jurisdictional Attacks**
24
            ABC Arbitrage – a French arbitrage firm – will likely be subjected to unique defenses and
25
     jurisdictional attacks preventing it from actively participating in this litigation and adequately
26
     protecting the class. Accordingly, ABC Arbitrage should not be appointed lead plaintiff.

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)          - 9 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1    Recently, Judge Catherine C. Blake of the District of Maryland in *Royal Ahold*, and Judge

2  Gerald Lee of the Eastern District of Virginia in *Cable & Wireless* each had occasion to address

3  competing proposed lead plaintiff applications. In both cases, the courts found that the appointment

4  of a foreign lead plaintiff would ***unnecessarily*** subject the class to the unique defense of lack of

5  subject matter jurisdiction. *See Royal Ahold*, 219 F.R.D. at 352; *Cable & Wireless*, 217 F.R.D. at

6  377.

7    In *Royal Ahold*, Judge Blake rejected the appointment of two separate movant groups with

8  the largest financial interest due, in large part, to the involvement of those groups' foreign movants.

9  *See* 219 F.R.D. at 353-54. Instead, Judge Blake appointed the domestic movants with the third

10  largest financial interest, reasoning that they were both "domestic investors [and were] not subject to

11  the jurisdictional questions that affect[ed] [the foreign investment advisors]. Similarly, there is no

12  question of the *res judicata* effect of a judgment in favor of Royal Ahold on [them], as domestic

13  plaintiffs." *Id*. at 355. Just like in *Royal Ahold*, here there are serious questions that would affect the

14  entire class if ABC Arbitrage was appointed. Yet there is no question that the Court has subject

15  matter jurisdiction over the Fan Group's claims.

16              **4.    ABC Arbitrage Resides Too Far Away to Be an Effective Lead
                        Plaintiff**

17

18    ABC Arbitrage is located in Paris, France, which is nine time zones, over 5,000 miles, and

19  more than 11 hours flying time from this District. As a lead plaintiff Movant which has opted not to

20  move together with other U.S.-based class members, ABC Arbitrage's location so far away from the

21  Court will likely prevent it, as a practical matter, from making necessary appearances in this action

22  and will undoubtedly impact its ability to serve as an adequate lead plaintiff.

23    Courts have recognized the potential difficulty of appointing foreign movants as the only lead

24  plaintiffs. For example, in *In re Network Assocs. Sec. Litig.*, 76 F. Supp. 2d 1017, 1029 (N.D. Cal.

25  1999), Judge Whyte refused to appoint two European financial institutions, like ABC Arbitrage, as

26  lead plaintiff because of the practical problems of ABC Arbitrage serving as lead plaintiff. The court

    ultimately held:

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)              - 10 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

        Finally, both ING and KBC are foreign organizations. They are distant. They were the only candidates not to attend the lead plaintiff hearing even though the Court requested all candidates to do so by order dated October 13, 1999. The distances involved and some differences in business culture would impede their ability to manage and to control American lawyers conducting litigation in California. At trial, the representative plaintiff would normally testify and attend. In a long trial, it would be obviously difficult for ING and KBC to attend in its entirety. The Court certainly does not say that a foreign investor could never qualify. But these factors, when added to the others set forth above, reinforce the Court's conclusion that neither KBC nor ING can fairly and adequately represent the class.

*Id.* at 1030. The analysis in *Network Assocs.* applies equally here, where not only is ABC Arbitrage a foreign movant, it has submitted a defective certification and is subject to potentially debilitating defects. *See infra* §II.B.4. As such, this Court should decline to appoint ABC Arbitrage as lead plaintiff in this action.

        "[T]he Court is charged with protecting" the class, and the appointment of ABC Arbitrage would inevitably subject the class to substantial and unnecessary risks. *See Critical Path*, 156 F. Supp. 2d at 1110-11. The disabling defects of the ABC Arbitrage would hang over the class like the proverbial "sword of Damocles." *See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 358 (S.D.N.Y. 2002) (declining to certify an investment manager like ABC Arbitrage even after the Court appointed the investment manager as a lead plaintiff).

### C.    The Rothamel Group Cannot Be Appointed as Lead Plaintiff

        The Rothamel Group, in addition to possessing a smaller financial interest than the Fan Group, has submitted certifications which are littered with inaccuracies which provide to the Court a distorted view of its standing and financial position. To illustrate, six of Louis Milstein's purchases on February 23, 2005 fall outside the trading range for that day. Similarly, the information provided to the Court for Bruce Spencer's sale of 4,000 shares on January 21, 2005 is defective as this trade also falls outside the daily trading range. The Rothamel Group's incomplete and inconsistent information provided to the Court in its certifications and loss chart renders it inadequate to represent the class and lead this litigation. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii). As such, the Rothamel Group cannot be appointed lead plaintiff.

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)

- 11 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1       **D.**    **The Remaining Movants Cannot Be Appointed as Lead Plaintiff**

2       As clearly demonstrated above, the Fan Group has both the greatest financial interest in the

3 litigation and otherwise satisfies Rule 23's typicality and adequacy requirements. Consequently, it is

4 presumptively the most adequate plaintiff to serve as lead plaintiff in this case. 15 U.S.C. §78u-

5 4(a)(3)(B)(iii)(I). This presumption can only be rebutted if the competing movants present "proof"

6 that the Fan Group either will not fairly and adequately protect the interests of the class; or is subject

7 to unique defenses that render it incapable of adequately representing the class. 15 U.S.C. §78u-

8 4(a)(3)(B)(iii)(II); *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir., 2002). Because all of the

9 competing movants possess smaller interests than the Fan Group and cannot offer any evidence, let

10 alone proof, that rebuts the presumption that the Fan Group is the most adequate plaintiff, the Fan

11 Group should be appointed as lead plaintiff and the motions of the competing movants to be

12 appointed as lead plaintiff should be denied.

13 **III.**    **CONCLUSION**

14       For the foregoing reasons, and for the reasons set forth in its moving papers, the Fan Group

15 respectfully requests that the Court consolidate the related actions, appoint the Fan Group as lead

16 plaintiff and approve its choice of co-lead counsel for the class.

17 DATED: May 23, 2005             Respectfully submitted,

18                        LERACH COUGHLIN STOIA GELLER

19                         RUDMAN & ROBBINS LLP
                       TAMARA J. DRISCOLL (WSBA #29212)

20

21                           s/ Tamara J. Driscoll
                       TAMARA J. DRISCOLL

22

23                      1700 Seventh Avenue, Suite 2260
                     Seattle, WA 98101
                     Telephone: 206/839-0730

24                      206/839-0728 (fax)
                     tdriscoll@lerachlaw.com

25

26

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)      - 12 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
billl@lerachlaw.com
darrenr@lerachlaw.com

DYER & SHUMAN, LLP
KIP B. SHUMAN
801 East 17th Avenue
Denver, CO 80218-1417
Telephone: 303/861-3003
303/830-6920 (fax)
kshuman@dyershuman.com

[Proposed] Co-Lead Counsel for Plaintiffs

S:\CasesSD\Cell Therapeutics\BRF00021350.doc

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)            - 13 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978

## DECLARATION OF SERVICE BY FACSIMILE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 401 B Street, Suite 1600, San Diego, California 92101.

2.      That on May 23, 2005, declarant served by facsimile THE FAN GROUP'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR APPOINTMENT AS LEAD PLAINTIFF PURSUANT TO §21D(A)(3)(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND IN OPPOSITION TO ALL COMPETING MOTIONS to the parties listed on the attached Service List.

3.      That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of May 2005, at San Diego, California.

_____
                    /s/ Lisa J. Valle
                    LISA J. VALLE

THE FAN GROUP'S MEMO OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR APPOINTMENT AS
LEAD PLAINTIFF (2:05-cv-00396-RSM)

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1700 Seventh Avenue, Suite 2260
Seattle, WA 98101
Telephone: 206/749-5544 • Fax: 206/749-9978



## NEW JERSEY CARPENTERS FUND

**Home | Newsletter | Downloads | Guestbook | Links | NJ State Council of Carpenters | Regional Council | Board Of Trustees**

The New Jersey Carpenters Funds is the combined name of the New Jersey Carpenters Pension Fund, Annuity Fund, Health Fund and Vacation Fund. These funds were established as the result of a Collective Bargaining Agreement between the unions of the United Brotherhood of Carpenters & Joiners of America (UBCJA) and various employer organizations throughout the State of New Jersey.

All funds are administered by a joint Board of Trustees consisting of an equal number of employer and employee designated Trustees. All benefits are provided from fund assets which are accumulated under the provisions of the Collective Bargaining Agreement and Trust Agreements.

Last Updated: June 10, 2003
Contact Us

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS (BOSTON)

| | |
|---|---|
| CHARLES BROWN, Individually and On Behalf of All Others Similarly Situated, | 1:05-cv-10400 (RCL) |
| Plaintiff, | |
| vs. | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER, and JAMES MULLEN, | |
| Defendants. | |
| CARY GRILL, Individually and On Behalf of All Others Similarly Situated, | 1:05-cv-10453 (RCL) |
| Plaintiff, | |
| vs. | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER and JAMES MULLEN, | |
| Defendants. | |
| ROCHELLE LOBEL, Individually and On Behalf of All Others Similarly Situated, | 1:05-cv-10801 (RCL) |
| Plaintiff, | |
| vs. | |
| BIOGEN IDEC, INC., WILLIAM RASTETTER and JAMES MULLEN, | |
| Defendants. | |

**REPLY AFFIDAVIT OF NEIL KAZAROSS IN FURTHER SUPPORT OF THE MOTION OF THE BIOGEN INSTITUTIONAL INVESTOR GROUP FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF CO-LEAD AND LIAISON COUNSEL AND IN OPPOSITION TO THE COMPETING MOTIONS**

STATE OF ILLINOIS           )
                            )        ss.:
COUNTY OF COOK              )

Neil Kazaross, being duly sworn, deposes and says:

      1.     I am the Senior Partner of Third Millennium Trading, LLP ("Third Millennium").

I respectfully submit this Reply Affidavit In Further Support Of The Motion Of The Biogen

Institutional Investor Group, For Consolidation, Appointment Of Lead Plaintiff, And Approval

Of Lead Plaintiff's Selection Of Co-Lead And Liaison Counsel And In Opposition To The

Competing Motions. This Affidavit is also submitted in response to the unsupported and untrue

assertions regarding Third Millennium which are set forth in the Memorandum In Further

Support Of The Motion Of The London Pensions Fund Authority And National Elevator

Industry Pension Fund (collectively, the "London Group") For Consolidation, Appointment As

Lead Plaintiff And For Approval Of Selection Of Lead And Liaison Counsel And In Opposition

To Competing Motions ("London Group Opposition").

      2.     Formed in 1997, Third Millennium is an institutional investor that invests in

common stock and options of many different companies. The Firm has offices in Chicago and

New York and employs approximately 20 proprietary traders.

      3.     Third Millennium is also a fully reporting member of the National Association of

Securities Dealers ("NASD"), which registers member firms, writes rules to govern their

behavior, examines them on a monthly basis for compliance and disciplines firms that commit

infractions. The Firm is also registered with the U.S. Securities and Exchange Commission and

is a member of the Chicago Board Options Exchange ("CBOE"), the American Stock Exchange

and the Chicago Mercantile Exchange. By virtue of its registration and membership with these

regulatory bodies, Third Millennium is subject to strict regulatory controls, from compliance

with various federal regulations concerning, for example, minimum net capital requirements to fulfillment of books and records requirements.

4.      Third Millennium's proprietary traders are highly educated and trained, and have the benefit of state-of-the-art information systems that enable them to communicate with the market. Their capabilities include market monitoring, market and technical analysis, and order entry. Third Millennium's traders consistently follow news and other information disseminated in the market concerning the companies in which they invest. Specifically, through press releases and other public statements issued by such companies, as well as analyst research reports and issuer conference calls, Third Millennium traders are continually reviewing market news and information affecting their investments. In this regard, Third Millennium traders make investment decisions based on news and other information disseminated to the market by publicly traded companies, such as Biogen Idec Inc. ("Biogen"), and other sources.

5.      According to the National Association of Securities Dealers ("NASD") Manual, a Market Maker on the Nasdaq National Market Exchange (the "NASDAQ") is "a dealer who either regularly publishes bid and ask quotations in an interdealer system or furnishes such quotations on request, and who is 'ready, willing, and able' to trade reasonable quantities of the security in which he is making a market to other dealers at his quoted prices." A NASDAQ Market Maker is required to apply for registration with the NASD as an official Market Maker in the Nasdaq Market Execution System. Registration as a Market Maker is a unique, distinguished and undeniable position that has a specific designation and, thus, can not be applied to simply any investor. The NASDAQ Market Maker position is comparable to a Specialist on the New York Stock Exchange ("NYSE" or "Exchange") who is required to keep records of all purchases and sales initiated on the trading floor of the NYSE for stocks, options, futures and foreign

securities in which he is registered. NYSE Specialists also ensure that all bids and asks during daily and after-hours trading sessions are reported in an accurate and timely manner, that all marketable trades are executed and that order is maintained on the trading floor. NYSE Specialists are required to register with the NYSE and gain the Exchange's approval as a particular type of Specialist. On the CBOE, the comparable position is the Designated Primary Market Maker ("DPM"), whose responsibilities and obligations are similar to those of NASDAQ Market Makers and NYSE Specialists.

6.      Despite the London Group's contention, Third Millennium is *not* a Market Maker in Biogen common stock because it has not been duly authorized by the NASD to act in that position. The NASD has not provided Third Millennium with Market Maker privileges, nor has it encumbered Third Millennium with Market Maker responsibilities or obligations. With regard to Biogen options traded on the CBOE, the DPM is Citadel Derivatives Group LLC. Accordingly, Third Millennium is *not* the DPM of such options. Rather, Third Millennium is a sophisticated institutional investor that freely invests in many different options both on and off the floor of the CBOE for its own account.

7.      Third Millennium's proprietary traders consciously engage in transactions based upon the price of a given company's stock or options, its reported financials, the Firm's proprietary methodologies and other publicly available information. In the instant case, Third Millennium's trade decisions were primarily made by one of its proprietary traders relying on the information provided to the market by the defendant company, Biogen, as well as other sources. While it is true that any investor which is able to trade options on the floor of the CBOE can loosely be referred to as a "market maker," that term is completely different from the DPM discussed above. With regard to Biogen, Third Millennium was under no obligation to purchase

Biogen options. Instead, it purchased such options as any investor, based upon its own investment decisions in light of the price of such options and related information in the market. Accordingly, the London Group's contentions that Third Millennium does "not rely on the integrity of the market" and that it employs "unique trading strategies, which are not typical of the class" (London Group Opposition, at 3) are completely false.

8.    Third Millennium's Certification, filed in connection with its motion to be designated as a lead plaintiff, sets forth its trades in Biogen securities that are the subject of this action. All of these transactions were executed in Third Millennium's proprietary trading account. While it is true that Third Millennium purchased and sold Biogen options during the operative Class Period as part of its overall investment strategy, those transactions did not significantly alter the damages the Firm suffered in connection with its purchases and sales of Biogen common stock. As set forth in Schedule A to Third Millennium's Certification, Third Millennium suffered losses of $3,068,480.56 as a result of its purchases and sales of Biogen common stock. While the Firm made approximately $500,000 as a result of its Biogen options transactions, Third Millennium still suffered cumulative losses of over $2,500,000 as a result of the defendants' wrongdoing.

9.    Despite the London Group's contention, Third Millennium does not have a "proprietary" relationship with Merrill Lynch which would compel the Firm to alter its litigation position in this case. The fact that Third Millennium currently clears its trades through Merrill Lynch in no way creates a prejudicial relationship at the expense of the Class. In fact, Third Millennium only recently began clearing through Merrill Lynch as a result of Merrill Lynch's acquisition of Pax Clearing Corporation, Third Millennium's prior clearing firm, which closed on April 28, 2005. There are a number of clearing firms which Third Millennium could clear

4

through and the fact that the Firm currently clears through Merrill Lynch is of no moment.  Third

Millennium intends to vigorously prosecute this litigation with the other members of the Biogen

Institutional Investor Group and is particularly motivated to do so given the substantial damages

it incurred as a result of the defendants' wrongdoing.

10.    Third Millennium will work together with the other members of the Biogen

Institutional Investor Group in this litigation toward a successful resolution.  The Firm

understands that Entwistle & Cappucci LLP ("Entwistle & Cappucci") has successfully

prosecuted numerous securities class actions with Milberg Weiss Bershad & Schulman LLP

("Milberg Weiss") as Co-Lead Counsel, and believes that the appointment of both firms as co-

lead counsel in this litigation would best serve the interests of the Class.  Third Millennium also

stands ready, willing and able to serve as a Class Representative in this case and looks forward to

testifying at a deposition and/or trial, if necessary.  The Firm will further assist in the prosecution

of the litigation by providing documents and other information supporting plaintiffs' case.

11.    For the reasons set forth in the submissions before the Court as well as the facts

set forth in this affidavit, Third Millennium respectfully requests that the Court approve its

application to be appointed Lead Plaintiff and approve its choice of Entwistle & Cappucci and

Milberg Weiss as Co-Lead Counsel and Moulton & Gans, P.C. as Liaison Counsel, to represent

the Class in this litigation.

Respectfully Submitted by:

Neil Kazaross
Senior Partner
Third Millennium Trading, LLP

Sworn to before me this
25th day of May, 2005

Notary Public

"OFFICIAL SEAL"
REBECCA ANN KAY
COMMISSION EXPIRES 06/03/06
NOTARY PUBLIC
STATE OF ILLINOIS

6